CURTIS BAY TOWING COMPANY *v.* CHARLES
W. DEAN

[No. 13, April Term, 1938.]

500

*Decided May 25th, 1938.*

The cause was argued before BOND, C. J., URNER, OF-FUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*William L. Marbury, Jr.,* and *G. Van Velsor Wolf,* with whom were *Marbury, Gosnell & Williams* on the brief, for the appellant.

*George Forbes* and *Henry L. Wortche,* for the appellee.

MITCHELL, J., delivered the opinion of the Court.

The suit in this case was instituted under the provisions of section 33 of the Act of Congress approved June 5th, 1920, known as the Merchant Marine Act of 1920, or the Jones Act (46 U. S. Code Ann., sec. 688); and the appeal is from a judgment of the Superior Court of Baltimore City, entered on a verdict of a jury in favor of the plaintiff, the appellee in this court.

The injury complained of occurred on November 4th, 1936, at which time Charles W. Dean, the appellee, was employed by the appellant as a seaman, having been continuously in such employment for more than eight years. He was attached to the crew of the steam tugboat "Curtis Bay," owned by the appellant, which was then afloat at the dock of the Baltimore Ship Repair Company in the City of Baltimore, for the purpose of general inspection and certain repairs. The vessel was in charge of its regular crew; and the payrolls submitted in evidence, covering the period in which the ship had been at the dock, and including the date on which the accident occurred, show that the several members of the crew, of which the appellee was one, were paid the same wages while the tug-

boat was in port which they each received when it was in active service. The appellee testified that on the morning of the accident he reported for duty shortly before seven o'clock, and first went to the galley, where he started a fire, and where, while the ship was up for repair, the members of the crew, other than officers, were permitted to change to their working clothes, that while the indicated members of the crew were allowed to change their clothing in the galley, the regulations of the vessel required that their work clothes be kept in the forecastle; that after starting the fire he proceeded to enter the forecastle to get his clothes, for the purpose of returning to the galley to change them; that at the time there were no artificial lights in service on the tug available, the ship being furnished with such light, while undergoing repair, from the dock, through means of sockets which could be connected with the wiring of the ship, but that the current from the dock was not turned on until the men in the shop began work at eight o'clock a. m.; that the weather was cloudy and foggy, when he proceeded to the forecastle, located forward and below the main deck; that the entrance to the same was through a small doorway on the port side of the main deck, and descent to the floor of the forecastle, eight feet below, was by means of a vertical ladder; that the only light in the forecastle at the time was a vague one, which came through the entrance doorway, which measured two and a half or three feet square, and such light as gleamed through thick glass panes in the ceiling of the forecastle, these panes being approximately six inches long and two inches wide, and covered with dirt caused by men working on the main deck. The witness further testified that, upon reaching the floor of the forecastle, he proceeded to the starboard side of the ship, where he had laid his work clothes on the preceding evening, on a coil of rope, and picking them up, began to retrace his steps towards the ladder; that at a point near the center of the forecastle he met a fireman of the ship, who was proceeding across the floor for the purpose of getting his work clothes, and,

as he passed the fireman, his left leg suddenly plunged through the floor; that he did not at the time know of or detect any hole in the floor, and that if a hole existed, it was "camouflaged," in that it was covered over with rope, upon which he stepped; that, as he fell, he struck a water bucket, and because of the impact, received the serious injuries which form the basis of the suit; that the shock of the injury rendered him unconscious, and for that reason he was unable to state the size of the hole through which his foot plunged, or whether it was in existence at the time he stepped on the rope, or broke through from the weight of his body. On cross-examination the witness testified that he knew the general condition of the floor was at one time supposed to be bad, but that he had never detected any hole in any part of it, in his daily visits to change his clothes; that he had heard that Koenig, another member of the crew, had fallen into a hole in the floor two days before, but that he had never seen the latter hole, and was told by the mate that it had been patched up; that he was transferred to the ship during the month of May previous to the accident, and had known before of the general condition of the floor, because he had previously served on the boat, but that when he was on the vessel before his last transfer thereto, the then mate had ordered "a lot of wood, and the mate that followed us claimed that he had fixed the floor. He told us, and I seen some of the work he did, right at the foot of the companionway."

Herman J. Mooney, the fireman referred to by the appellee, corroborated the latter's testimony in that, on the morning of the accident, he entered the forecastle just after the appellee; that there was only the light of the open door, and two small thick glass lights imbedded in the floor of the deck, which were not clean, and were possibly painted over or scratched up. He described the light as "just a beam that would hit a certain place on the floor," and added that there were no port holes; that as he walked towards the side of the forecastle from which the appellee was coming, and passed him, the latter

fell through a hole in the floor. He then stated: "A bucket flew from under him and he threw himself back on a coil of rope, a pile of unstranded rope, that was in the center of the forecastle. The rope was on the edge of the hole, and after Dean had got out of it, you could see the hole clear. * * * After Dean had been removed from the forecastle, a bight or loop of rope was in the hole, which was, I'd say, five or six inches wide and eighteen inches long." He did not see the bucket until it "flew from under" Dean. Further testifying, he stated that the condition of the floor around the hole was very bad, a lot of unstranded rope was in the hole and thrown in roughly, that he did not see it before the accident, and that after the accident work was started to put in a complete new floor; that he made a casual examination of the hole, and could not say whether it was a fresh break in the floor, but that he heard no wood crack as the appellee fell in.

A photostatic copy of the certificate of enrollment and license by the Department of Commerce, filed in the case, shows that the tug at the time of the accident was duly licensed for coasting trade; a like copy of the certificate of inspection shows the capacity of the craft to be 133 gross tons; and it is also shown by a photostatic copy of the master's certificate of service of sick or injured seamen, filed in the case, that on the date of the accident the mate of the tug, on behalf of its captain, certified that the appellee was employed on board in the care, preservation or navigation of the tug "Curtis Bay," for the purpose of his admission for treatment at a marine hospital of the U. S. Public Health Service.

Testimony of Everett F. Hall was adduced on behalf of the appellant, to the effect that he was employed by the Baltimore Towage & Lighterage Company, and in charge of certain repair work which was being done on the tug at the time of the accident; that, prior to the injury of the appellee, no repairs had been made on the forecastle, but that after the injury he was ordered to renew the forecastle floor, and, although it was replaced

with a new floor, there was nothing wrong with it except the hole, which was discovered after the ropes were removed. This witness also testified that, prior to the happening of the accident, certain decking had been removed above the forecastle, through which light gleamed; and, in conflict with the appellee's testimony, stated that artificial lights were available at the time of the accident, had the connections been plugged in by any one on the tug.

The declaration contains two counts, the first alleging the negligence of the appellant in not providing the appellee with a safe place in which to perform his work; and the second, its negligence in permitting a hole to remain in a dark space in the deck of the forecastle. To the declaration the appellant pleaded, (a) the general issue plea, and (b) that the plaintiff was not, at the time of the accident complained of, either the master or a member of the crew of any vessel, nor was he a person engaged by the master to load or unload or repair any small vessel under eighteen tons net, and that accordingly the plaintiff is entitled to compensation under the Longshoremen's and Harbor Workers' Compensation Act of 1927, U. S. Code, title 33, sec. 901 and following (33 U. S. Code Ann., sec. 901 *et seq.*), and is excluded from all other remedy against the defendant.

The section of the Merchant Marine Act of 1920, to which reference has hereinbefore been made, provides in part: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railway employees shall apply." In U. S. Code Ann., title 45, "Railroads," sec. 53, it is provided in part: "In all actions hereafter brought against any such common carrier by railroad" (interstate) "under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have

resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee."

The single exception found in the record relates to the ruling of the trial court on the prayers. At the trial of the case below the court granted four prayers submitted by the plaintiff. The first of these is the usual form of damage prayer; and to the granting of it no objection was pressed in this court. The second prayer is as follows: "The plaintiff prays the court to instruct the jury that if they shall find from the evidence that the plaintiff was injured as detailed in the evidence while employed as a seaman, sailor or deckhand aboard the tug 'Curtis Bay,' owned by the defendant, if the jury so find, and if the jury shall further find that the defendant failed to furnish the plaintiff with a reasonably safe place to work on said tug, and that as a direct result thereof the plaintiff was injured, then their verdict should be for the plaintiff." By the fifth, the jury was instructed that if they found that the defendant failed to furnish the plaintiff with a reasonably safe place to work, and that as a direct result the injury ensued, then their verdict should be for the plaintiff, even though they also found that the plaintiff contributed to his injury, but that in such event the damages should be diminished by the jury in proportion to the amount of negligence attributable to the plaintiff. The sixth prayer, which was granted in connection with the appellee's fifth prayer, instructed the jury that if they found the plaintiff was injured as detailed in the evidence, and that said injury was due to a defective and unseaworthy condition of the floor of the forecastle, then in that event the plaintiff did not assume the risk of said defective and unseaworthy condition of the forecastle floor.

Of the twenty-four payers submitted by the defendant, four were granted and the remainder rejected. The first granted prayer instructed the jury that the burden rested

upon the plaintiff to prove that the injury complained of was caused or contributed to by negligence of the defendant, either as the sole or contributing cause, and that if the minds of the jury were in equipoise as to whether the negligence of the defendant was the sole or contributing cause of the injury complained of, then their verdict should be for the defendant; the second instructed the jury that the burden was on the plaintiff to prove negligence on the part of the defendant, and that if negligence on the part of the defendant be not proved, the verdict must be for the defendant; the fourth, that even though the jury found the defendant was negligent, nevertheless, if they further found that such negligence did not contribute to the injury complained of, and that the sole direct cause of the injury was the act of the plaintiff, then their verdict should be for the defendant; and the fifth was an instruction similar to the fifth prayer of the plaintiff, relating to the apportionment of damages in case of contributory negligence.

At the hearing in this court it was urged by the appellant that there was error in the granting of the appellee's second and fifth prayers, and in the rejection of the appellant's several prayers which sought instructions as to assumption of risk by the appellee, as well as its sixth prayer, which latter prayer sought an instruction that if the jury found from the evidence that the floor of the forecastle was in good condition and sufficiently strong for the purposes for which it was ordinarily used, except for the hole into which the plaintiff put his foot, and they further found that said hole was not one of which the defendant knew, or ought to have known if it had used due diligence, then the defendant was not negligent.

It can hardly be logically contended that under the facts in the instant case the appellee is not shown to have been a "seaman" within the purview of the maritime law. The term "seaman" may be properly applied to any person who is employed in the practical operation

and management or navigation of a ship; and while originally only common sailors were classed as seamen, the peculiar privileges and the protection afforded to seamen by the general maritime law have been extended to persons performing services of various sorts, as mate, engineer, fireman, deckhand, carpenter, etc. *Holt v. Cummings,* 102 Pa. 215. As in the case before us, a seaman is usually a member of the crew, as distinguished from a longshoreman or harbor worker; and under 33 U. S. Code Ann., sec. 902, subsec. 3, known as the Longshoremen's and Harbor Workers' Compensation Act, it is provided that: "The term 'employee' does not include a master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." The tonnage of the vessel upon which the appellee was employed as a seaman, as has been indicated, far exceeds the maximum tonnage prescribed in the section just quoted; and it would therefore seem clear that the compensation act, designed to afford protection for longshoremen and harbor workers, is not available to him as set forth in the special plea of the appellant. Especially is this true when the uncontradicted testimony is to the effect that the appellee was at the time of receiving his injury employed as a sailor, had been so employed for over eight years by the appellant, was so designated on its payroll, was aboard the ship afloat in navigable waters, and subject to the orders of his superior officers, namely, captain and mate. However, if further evidence were needed to establish the status of the appellee at the time he was injured, that evidence is found in the certificate to the Marine Hospital, to which reference has hereinbefore been made.

Under the maritime law, as administered both in this country and in England, prior to the adoption of the Jones Act, the rights of seamen may be summarized, for the purpose of this opinion but not definitely, as follows: (1) That the vessel and her owners were liable, in case the seaman fell sick or was wounded in the service

to the ship, to the extent of his maintenance and cure, and to his wages at least so long as the voyage was continued; (2) that the vessel and her owners were liable to an indemnity for injuries received by the seaman in consequences of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship; (3) that all members of the crew, except perhaps the master, were, as between themselves, fellow servants, and hence the seaman could not recover for injuries sustained through the negligence of another member of the crew, beyond the expense of his maintenance and cure; and (4) that the seaman was not allowed to recover indemnity for negligence of the master or any member of the crew, but was entitled to maintenance and cure, whether the injuries were received by negligence or accident. *Kalleck v. Derring,* 161 Mass. 469, 37 N. E. 450; *The Frank and Willie* (D. C.) 45 Fed. 494; *The City of Alexandria* (D. C.) 17 Fed. 390; *Scarff v. Metcalf,* 107 N. Y. 211, 13 N. E. 796; *The Osceola,* 189 U. S. 158, 159, 23 S. Ct. 483, 47 L. Ed. 760. In other words, aside from the liability which the vessel and owners, under all circumstances of injury, owed the seaman for maintenance and cure, further liability to the seaman was dependent upon the question of the unseaworthiness of the ship or a failure to supply and keep in order proper appliances and equipment, pertaining to the ship, and the forum was in admiralty. Section 33 of the Merchant Marine Act of 1920 amended section 20 of the Seamen's Act of 1915; and in the case of *Lindgren v. United States,* 281 U. S. 38, 50 S. Ct. 207, 74 L. Ed. 686, it is said (page 208) : "By this Act, as heretofore construed by this Court, the prior maritime law of the United States was modified by giving to seamen injured through negligence the rights given to railway employees by the Federal Employers' Liability Act and its amendments [45 U. S. Code Ann., sec. 51 *et seq.*] and permitting these new and substantive rights to be asserted and enforced in actions *in personam* against the employers in federal and state courts administering common law

remedies, or in suits in admiralty in courts administering maritime remedies. *Panama R. Co. v. Johnson*, 264 U. S. 375, 44 S. Ct. 391, 68 L. Ed. 748; *Engel v. Davenport*, 271 U. S. 33, 46 S. Ct. 410, 70 L. Ed. 813; *Panama R. Co. v. Vasquez*, 271 U. S. 557, 46 S. Ct. 596, 70 L. Ed. 1085; *Baltimore S. S. Co. v. Phillips*, 274 U. S. 316, 47 S. Ct. 600, 71 L. Ed. 1069; *Pacific S. S. Co. v. Peterson*, 278 U. S. 130, 49 S. Ct. 75, 73 L. Ed. 220."

Stated differently, the alternative common law remedy of an action to recover compensatory damages, as distinguished from the allowance covered by the old maritime rules, may be enforced by a seaman through appropriate proceedings *in personam* on the common law side of both federal and state courts, upon the ground of negligence. In such a suit the seaman not only assumes the burden of proving negligence, but also, under section 3 of the Federal Employers' Liability Act, 45 U. S. Code Ann., sec. 53, subjects himself to a reduction of damages in proportion to any contributory negligence on his part. *Engel v. Davenport, supra; Panama R. Co. v. Johnson, supra.* By virtue of the adoption of this section, any seaman suffering personal injury in the course of his employment may, at his election, maintain an action at law, with the right to trial by jury, and in such action all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railway employees apply. The statute is not intended as an encroachment upon the maritime law as it existed prior to its enactment, but has been construed by the Supreme Court of the United States to be "a permissible addition to that law of new rules concerning the rights and obligations of seamen and their employers." By the act, injuries to seamen are not withdrawn from the operation of the maritime law, nor are they themselves permitted to do so; but the statute applies to that law new rules drawn from another system, and therefore extends to injured seamen a right to invoke, at their election, either the relief accorded by the old rules or that provided by the new rules.

It is strenuously urged by the appellant that the appellee is chargeable with the assumption of the risk in this case; but with that contention we cannot agree. In the recent case of *The Arizona v. Anelich*, 298 U. S. 110, 56 S. Ct. 707, 80 L. Ed. 1075, it is said (page 711): "Before the Jones Act contributory negligence was ground for mitigation of damages in suits brought by seamen to recover for injuries attributable to defective equipment. * * * But no American case appears to have recognized assumption of risk as a defense to such a suit. In numerous cases this defense was either denied or ignored in circumstances plainly calling for its application had it been available. * * * The seaman assumes the risk normally incident to his perilous calling, * * * but it has often been pointed out that the nature of his calling, the rigid discipline to which he is subject, and the practical difficulties of his avoiding exposure to risks of unseaworthiness and defective appliances, make such a defense, as distinguished from contributory negligence, * * * peculiarly inapplicable to suits by seamen to recover for the negligent failure to provide a seaworthy ship and safe appliances. * * * Like considerations, and others to be mentioned, require a like conclusion with respect to the modified and in some respects enlarged liability imported into the maritime law by the Jones Act. The legislation was remedial, for the benefit and protection of seamen who are peculiarly the wards of admiralty. Its purpose was to enlarge that protection, not to narrow it. * * * Its provisions, like others of the Merchant Marine Act (41 Stat. 988), of which it is a part, are to be liberally construed to attain that end, * * * and are to be interpreted in harmony with the established doctrine of maritime law of which it is an integral part. The denial in the Federal Employers' Liability Act (45 U. S. Code Ann., secs. 51-59) of the defense of assumption of risk refers only to suits founded on the Federal Safety Appliance Act (45 U. S. Code Ann., sec. 1 *et seq.*), applicable alone to railroads. It can raise no inference as to the availability of the defense in suits brought to re-

cover for injuries to seamen. No provision of the Jones Act is inconsistent with the admiralty rule as to assumption of risk. The purpose and terms of the Act, and the nature of the juristic field in which it is to be applied, preclude the assumption that Congress intended, by its adoption, to modify that rule by implication."

In the case of *Beadle v. Spencer*, 298 U. S. 124, 126, 56 S. Ct. 712, 80 L. Ed. 1082, the injury was sustained by a seaman engaged in unloading lumber from the deck, by a fall in an open hatch. On the trial evidence was adduced tending to show that the lumber which the seaman was unloading was piled on the deck in such negligent manner as to render it unstable, and that, being piled alongside of an open hatch, it constituted an unsafe place to work for those required to go upon it. There, as here, the injury was sustained while the ship was in port, and while the seaman was not engaged in actual navigation; and there the trial court refused requests to charge that assumption of the risk by the seaman was a defense, but left it to the jury to say whether there was negligent failure of the master to provide a safe place for the respondent to work, and whether the failure was the proximate cause of the injury. The question whether a different rule applied because the injury occurred while the ship was in port was answered in the negative by the Supreme Court of California, and affirmed by the Supreme Court of the United States, which said (page 714) : "The injury resulting to the employee from the negligently piled lumber, in proximity to the open hatch, is made actionable by the Jones Act, by its adoption for the maritime law of the provisions of the Employers' Liability Act, which specifically imposes liability for negligence of officers and fellow employees, and for defects in equipment due to negligence. See *Zinnel v. U. S. Shipping Board Emergency Fleet Corp.* (C. C. A.) 10 Fed. (2nd) 47." Reaffirming the principle that assumption of the risk is not a defense to a suit under the Jones Act by a seaman for negligent failure of the master to provide a safe appliance or a safe place to work, as laid

down in *The Arizona v. Anelich* case, the Supreme Court added: "The rules, peculiar to admiralty, of liability for injuries to seamen or others, are as applicable when the injury occurs upon a vessel in port as when at sea, although the common law may apply a different rule to an injury similarly inflicted on the wharf to which the vessel is moored." *The Frank and Willie, supra.*

It may be stated as a well recognized principle that the law imposes upon the master the duty towards his servant of exercising due and reasonable care to provide and maintain a safe place in which to work. *Wood v. Heiges,* 83 Md. 257, 269, 34 A. 872; *Stewart & Co. v. Harman,* 108 Md. 446, 447, 70 A. 333; *Long Co. v. State Accident Fund,* 156 Md. 639, 144 A. 775; *Baker v. Maryland Coal Co.,* 84 Md. 19, 35 A. 10. What the employer is bound to do is to exercise due care to provide safety for his workmen; and what may or may not be due care depends upon the circumstances of each particular case. *Chesapeake & Potomac Tel. Co. v. Merriken,* 147 Md. 572, 577, 128 A. 277.

Either at common law or by maritime law, an unsound or defective floor of the forecastle of a ship where seamen must work is a breach of duty on the part of the ship owner to provide a safe place, material, and equipment for the seamen; and this the owner is bound to do for the safety of his crew. As has been seen, by the maritime law the seaman is entitled to indemnity for injuries by him received in consequence of the unseaworthiness of the ship or a failure to supply and keep in order the proper appliances and equipment, and make the repairs of the ship in order that she may be in a fit state. The care indicated is high but reasonable because of the nature of the service and the degree of dependency of the servant on the master. It may be said, therefore, that the duty to maintain seaworthiness, or that the ship is in a fit state as to repairs and equipment, is the measure of the care of the shipowner to the seaman. The failure to perform this duty is consequently a breach of the duty of the master to exercise the degree of care

required; and, although the duty sounded in contract, the failure to keep the ship seaworthy is a neglect of duty through the omission to use due care according to the circumstances, which is a tort.

It follows that the granted second and fifth prayers of the plaintiff's are not open to the criticism that they permit a recovery without a finding of negligence on the part of the defendant. These prayers permit the plaintiff to recover if the jury shall find that the defendant failed to furnish the plaintiff with a reasonably safe place in which to work on the tug, provided the jury should further find that this failure so to furnish such a place was the direct cause of the plaintiff's injury. Since, under the maritime law a ship is not seaworthy if the flooring where the seaman works on the tug is not reasonably safe for the seaman to do his work or to be, a failure of the owner to provide such reasonably safe place is a negligent breach of duty on the part of the owner; and leaving to the jury to find whether or not such a breach of duty was a fact and that as a further fact it was the direct cause of the injury received by the seaman, is a submission of the question of negligence *vel non* of the master to the jury, and made the right of the plaintiff to recover depend upon a finding of negligence.

Defendant's sixth prayer was properly rejected. It was calculated to mislead the jury by its segregation of the facts and in reference to the responsibility of the defendant to keep the flooring at the place of the accident in the condition in which from the nature of the employment the seaman had a right to expect that it would be kept. Further it was inconsistent with the theory upon which the case was rightly submitted to the jury.

In view of the instructions granted by the trial court at the instance of the defendant, as hereinbefore indicated: (a) that the burden rested upon the plaintiff to prove that the injury complained of was caused or contributed to by the negligence of the defendant, either as the sole or contributing cause, and that if their minds

were in even balance as to whether the defendant was negligent, or whether its negligence was either the sole or contributing cause of injury complained of, then their verdict must have been for the defendant; (b) that the burden was on the plaintiff to prove negligence on the part of the defendant, and that if the same was not so proven their verdict must have been for the defendant, and (c) that if they found that the defendant was negligent and that such negligence did not contribute to the accident and injuries complained of, and that the sole direct cause of such injury was due to the plaintiff, their verdict must have been for the defendant; we are of the opinion that the case was fairly submitted to the jury in a manner which gave the defendant no ground of complaint. Since no reversible error is found, the judgment must be affirmed.

It is submitted in the brief of appellant that in any event, the appellee should be charged in the sum of $90. as representing the cost of 15 pages of the printed record, and $67.50, representing the cost of nine photostats of official records, the same having been inserted in the record "at the insistence of the appellee, over the objection of the appellant"; and the claim being asserted under Rules 5 and 6 of this court. It is our conclusion that these photostats were properly inserted in the record; and inasmuch as some of the testimony to which objection is raised was also properly included, and a segregation of the costs of that which, in our opinion, was so included, from that which was not properly included, does not seem feasible, no separation of the costs will be ordered.

*Judgment affirmed, with costs to the appellee.*

BOND, C. J., filed a dissenting opinion as follows:

The plaintiff's third prayer for an instruction to the jury raises the question whether in a suit under the Jones Act negligence is essential to recovery, the instruc-

tion having omitted all reference to negligence and rendered the defendant liable as an insurer of a safe place for the plaintiff to work. It differed in this respect from other instructions given, but it was given as a complete guide to a verdict, and was, under Maryland practice, to have been taken as such. *Hilton Quarries v. Hall,* 161 Md. 518, 530, 158 A. 19. The majority opinion views it as complete and correct for the case.

My construction of the Jones Act differs. It was, indeed, conceded by counsel for the plaintiff in oral argument that negligence was an essential. If there was a mistake in omitting it as an element in the instruction, it had better be corrected now than after the delay of a further appeal.