FARRELL LINES, INCORPORATED *v.* DEVLIN ET AL.

[No. 45, October Term, 1956.]

408

*Decided December 11, 1956.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Robert H. Lilly,* with whom were *George W. Sullivan* and

*Robert H. Williams, Jr.,* on the brief, for appellant, Farrell Lines, Incorporated.

*Sol C. Berenholtz,* with whom was *Solomon Kaplan* on the brief, for appellee, John C. Devlin.

*Herbert F. Murray,* with whom were *Clater W. Smith* and *Clark, Smith & Prendergast* on the brief, for appellee, Atlantic & Gulf Stevedores, Inc.

HAMMOND, J., delivered the opinion of the Court.

The appellee Devlin, a seafaring man, hurt his ankle seriously when he jumped from the rail to the deck of the African Patriot, a freighter docked at Locust Point, Baltimore, which he had boarded by way of an improvised gangplank. Farrell Lines, Incorporated (Farrell), the appellant, owned the African Patriot. Atlantic & Gulf Stevedores, Inc. (Atlantic) was unloading the vessel at the time of the accident. Farrell furnished Devlin hospitalization and medical care. Devlin sued Farrell in the Superior Court of Baltimore for the maintenance to which an injured seaman is entitled and for damages. His claim for damages is based on unseaworthiness and negligence in not providing a safe means of boarding the vessel. He claimed, in the alternative, as a seaman and a business invitee. Farrell interpleaded Atlantic, alleging in its third party complaint that if Devlin had a cause of action it was a direct result of Atlantic's negligence during its stevedoring work and that, by written agreement, Atlantic had undertaken either expressly or impliedly to indemnify Farrell in such circumstances.

The jury, instructed by the court as to the applicable and controlling federal maritime law, found on issues that Farrell was Devlin's employer at the time of the accident, that the ship was unseaworthy, that Farrell was guilty of negligence contributing to the accident and injury, that Devlin had not been guilty of contributory negligence and, finally, that Atlantic had not been guilty of negligence directly contributing to the accident and injury. Appellant's arguments on the appeal from Devlin's judgment against it, both printed and fo-

rensic, complain that the trial judge erred to its prejudice by refusing, at the close of plaintiff's evidence, to direct verdicts for the defendants on various aspects of the case, in refusing to direct verdicts for the defendants when all of the evidence was in, again on various phases of the case, and in rulings on the evidence. Farrell's appeal from the judgment for Atlantic charges error in the court's refusal to charge the jury as a matter of law that Farrell was entitled to prevail on the allegations of its third party complaint.

Appellant is particularly aggrieved at the trial court's action at the conclusion of Devlin's case. Farrell's lawyers at that time told the court that they wished to "offer some prayers" and Atlantic's counsel said they wished to make "a motion also at this time". The court said: "I overrule all motions at this time, and will consider them at the end of the whole case." The record does not show what specific motions the defendants had in mind, nor does it show any further effort to have the court pass on the motions or any exception to the court's action. The case was ably tried below on both sides, as it was here. We have no doubt that counsel and the court had discussed thoroughly the matters as to which action was sought and were entirely aware of the effect of the court's action. Nevertheless, the trial court undoubtedly should have heard whatever motions the defendants desired to make and have allowed counsel to give reasons in support of the motions. However, we see no prejudice to the appellant in the court's having acted as it did. We were told at the argument here that at the end of the whole case, Farrell offered and argued fully the identical motions that it wished to make earlier. Devlin's case had been strengthened somewhat by evidence given by witnesses for the defendant; yet we find that Devlin had produced on his own behalf evidence sufficient to require the defendant to go forward.

Devlin had gone to the pier at which the African Patriot was docked to work as night relief mate from 5:00 P. M. to midnight, having been sent by his union, with which Farrell had a contract calling for the regular employment of such relief officers and the terms of the employment. Farrell claims that Devlin failed to meet the burden of proving that at the

time he was injured he was its employee, and so, a seaman to whom there is given by the admiralty law the right to maintenance and the right to damages for injuries resulting from unseaworthiness of the ship or from faulty equipment or appliances, and by the Jones Act, 46 U. S. C., Sec. 688, the right to sue the vessel owner for damages from negligence.

Farrell's grievance with the trial judge's treatment of evidence is (a) that he should not have admitted a paper given Devlin by the vessel's chief mate after he was hurt, certifying that Devlin was an employee of Farrell and, as such, entitled to be treated and cared for in the United States Public Health Service Hospital (the Marine Hospital), and (b) that his remarks in the presence of the jury were highly prejudicial and showed a prejudgment of the issue the jury had to decide, when he said the certificate purported to show that Devlin was employed by Farrell, that it was to be assumed that the chief mate knew that Devlin was not entitled to the certificate unless he were an employee and that "* * * at least he has certified that the plaintiff was an employee of the ship." Since the certificate, if proper evidence, was significant on the matter of Devlin's employment status, we find it appropriate to consider appellant's evidentiary objections at this stage. Farrell urges that the certificate was not signed by the master, as its printed heading "Master's Certificate" and the admonition on it that it "must be signed by the Master or Authorized Agent of the Vessel" indicate it should have been. It adds that it was not shown that the master was not on board and, so, that Devlin failed to prove the authority of the chief mate. We think it fairly to be inferred that the master was not on duty at the time of the accident. The presence, and station, on the ship of all of the other officers was testified to. The chief mate said he was in complete charge of the ship. Farrell seems to have argued to the court and jury that the master was not on board.

Next, it is contended that the first time that the chief mate encountered Devlin the accident had occurred so that Devlin was unfit for duty when he reported for work and the mate was without authority then to accept him as an employee. This is a somewhat circuitous argument because Farrell seems

to agree that if Devlin had gone to the mate before the accident and tendered the introductory slip given him by the union showing him to be the night relief officer, the chief mate would have had authority to recognize him and would in fact have recognized him as an employee. We fail to see how he lost the authority to give recognition of what he evidently deemed to be a fact the moment Devlin was hurt. He was not attempting to bind the ship or the owner, which Farrell argues was beyond the authority of a mate, by admitting liability (except as to responsibility for the cost of the hospitalization and this Farrell has not repudiated, or attempted to repudiate); he was merely certifying to a relationship which might or might not serve as the basis of liability. We think he had the right to do this much. Farrell offered no explanation in the testimony of why the certificate was given if Devlin were not an employee, nor has it offered any to this Court save the suggestion that it was an impulsive act of sympathy or benevolence to assure hospitalization. If Devlin had not been considered an employee, he could have been sent to a hospital other than the Marine Hospital. Only if he were a seaman when injured would he have been sent there.

We think the certificate was properly admitted. Once the certificate was in evidence, the trial judge's remarks as to what it purported to show and what the mate had certified, were mere repetitions of its contents—statements of the obvious. We feel that whatever emphasis the court's comments gave the obvious did not serve as a prejudgment of an issue that was for the jury to answer. In his charge the court carefully and precisely instructed the jury that nothing he had said during the trial as to the evidence was to give the impression that he had any particular views on the facts or on what solution should be made of conflict between witnesses or as to what inferences were to be drawn from the evidence. We think that there was no prejudicial error in the court's comments on the contents of the certificate.

In our opinion the matter of employment at the time of injury rightly was left to the jury. The master's certificate was the last link in this chain of evidence on the point, and a significant link, as was made manifest in *Curtis Bay Towing*

*Co. v. Dean,* 174 Md. 498, 508, where such a certificate was given great weight. Other links are the following details, which the jury could have found to be the facts: Devlin was an experienced officer holding a chief mate's unlimited license. He had served at sea for many years. For two years he had been on a list of qualified relief deck officers maintained by the union and had regularly worked as night relief mate in Baltimore harbor. The contract between Farrell and the union called for employment of two night relief officers, one to stand the 5:00 P. M. to midnight watch, the other from midnight to 8:00 A. M. Each is given a slip by the union on which are the name and location of the vessel, name of the bearer, and the type of work he is to do, such as relief mate. The slip is customarily given to the chief mate, to whom the man on the first watch usually reports. The two night mates decide between themselves who will stand which watch. The man on the second watch reports to no one but the night mate he relieves. The duties of the night relief mates are to substitute for the ship's officers so that they may go ashore, to check the ship's lines and lights and to oversee the stevedoring operations. The contract requires Farrell to pay the night relief mate's transportation if the vessel is docked far from the union hall. If the mate reports for duty he must be paid seven hours' pay whether he works or not. The contract refers to the duties of the relief mates as including the "* * * occasional slacking off and taking in slack lines * * *." The custom was for the night relief mates to check the lines when they arrived at the pier, before boarding the vessel. Devlin did this the night of the accident. Then he went to the regular gangway on the first level of the pier, which had an upper level also. The gangway was raised to permit railroad flat cars onto which mahogany logs were being loaded from the ship to pass back and forth on tracks that ran along the side of the pier next to the ship. Devlin told the gangway watchman, who was on the ship, that he was the night relief mate and wanted to come aboard. The ship's third mate was standing next to the gangway watchman. Devlin says the watchman told him that the gangplank would not be lowered for anyone, on the chief mate's orders, and if he must come

aboard, (Devlin having replied that he must) that he could come aboard at No. 2 hatch on the upper level of the pier, where stevedores and others were using an improvised gangway. The gangway watchman says (although Devlin denies it) he sent word to the chief mate that Devlin was on the dock and received the reply, which he relayed to Devlin, that he should stay on the dock, that he would be paid whether he came on board or not but the gangplank would not be lowered until the unloading was finished. The chief mate admits he first saw Devlin on the dock. Devlin went to the upper level, crossed the informal gangway, consisting of several planks—apparently regular ship's dunnage—laid from an unloading platform extending seaward from the pier eight or ten feet to the rail or bulwark of the African Patriot. Seeing no steps or ladder from the rail to the deck, he hesitated on the rail and then, anticipating that a load of cargo was coming out of No. 2 hold and would swing towards him, jumped to the deck and hurt his ankle when he landed on dunnage or on a painting stage or a coil of rope. Shortly thereafter, the chief mate gave him the certificate for the Marine Hospital.

Farrell relies on *Miller v. Browning S. S. Co.,* 165 F. 2d 209, as showing that Devlin was not an employee. There, an oiler was sent by his union to the ship to seek employment. The only evidence of employment was the contract between the union and the ship's owner. The court commented that the oiler had not spoken to—indeed, had not even been seen by—anyone in any way connected with the ship. The contract there specifically described one in the situation of the oiler as a "prospective employee". We see far more to have been shown here in the customary course of conduct, the contract, what Devlin did, and his contacts with the ship's personnel. We think it could be soundly inferred that relief deck officers sent by the union were to be, and were, accepted as employees as a matter of course, unless refused work for reasons such as, for example, drunkenness or insubordination, that would justify the dismissal or suspension of any employee. Where the evidence on the question of whether the relation of master and servant existed is conflicting, or more than one inference can be drawn from the evidence, the jury should de-

termine the answer. *Globe Indemnity Co. v. Victill Corp.,* 208 Md. 573, 585.

Farrell next contends that the trial court should have instructed the jury that, as a matter of law, the evidence showed (1) that there had been no act or omission making Farrell liable; (2) that Devlin himself had been negligent; and (3) that Devlin alone had brought the injury upon himself. These contentions, of course, stand or fall on the significance the controlling law gives the facts. Suits for damages for injuries occurring on navigable water, whether they be brought in an admiralty court, or the law side of a federal court, or in a state court, are controlled substantively by federal maritime law. The Supreme Court once again made this plain in *Pope & Talbot, Inc. v. Hawn,* 346 U. S. 406, 98 L. Ed. 143, when it said: "While states may sometimes supplement federal maritime policies, a state may not deprive a person of any substantial admiralty rights as defined in controlling acts of Congress or by interpretative decisions of this Court." See, too *Garrett v. Moore-McCormack Co.,* 317 U. S. 239, 87 L. Ed. 239; *Seas Shipping Co. v. Sieracki,* 328 U. S. 85, 90 L. Ed. 1099; *W. E. Hedger Transp. Corp. v. United Fruit Co.,* 198 F. 2d 376 (2 Cir.). This Court has recognized the State's obligation in this respect. *Frazier v. Waterman S. S. Corp.,* 206 Md. 434; *Curtis Bay Towing Co. v. Dean,* 174 Md. 498, cited above. The cases cited hold that when federal maritime law controls, contributory negligence is not an absolute bar as under "the harsh rule of the common law", but that "admiralty has developed and now follows its own fairer and more flexible rule which allows such consideration of contributory negligence in mitigation of damages as justice requires." (*Pope & Talbot, Inc. v. Hawn, supra*).

In January, 1939, the Supreme Court, in *Socony-Vacuum Oil Co. v. Smith,* 305 U. S. 424, 83 L. Ed. 265, pointed out that before the Jones Act, a seaman was entitled to receive from a vessel or its owner indemnities for injuries due to an unseaworthy vessel or improper appliances, and that contributory negligence was not a defense but merely mitigated damages, and said: "And no American case appears to have recognized assumption of risk as a defense to such a suit. In

numerous cases this defense was either denied or ignored in circumstances plainly calling for its application had it been available." The suit was under the Jones Act and the Court held that the development of the maritime law would best be served "by applying the rule of comparative negligence, rather than that of assumption of risk, to the seaman who makes use of a defective appliance knowing that a safe one is available." The Court's reasoning was that: "Any rule of assumption of risk in admiralty, whatever its scope, must be applied in conjunction with the established admiralty doctrine of comparative negligence and in harmony with it." The Jones Act gives the seaman who sues, whatever the forum, the benefit of all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railroad employees. The 1939 Congress amended the Federal Employer's Liability Act, 45 U. S. C. 54, to provide that where injury or death resulted in whole or in part from the negligence of the railroad or its agents or employees, the "employee shall not be held to have assumed the risks of his employment." In *Tiller v. Atlantic Coast Line R. Co.,* 318 U. S. 54, 87 L. Ed. 610, the Supreme Court said: "We hold that every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment * * *." In *Curtis Bay Towing Co. v. Dean,* 174 Md. 498, 511, discussed above, it was expressly held that the doctrine of assumption of risk was inapplicable in the case of a seaman injured by an unseaworthy vessel or faulty equipment.

The owner had an absolute and non-delegable duty to furnish his employees a seaworthy vessel and proper equipment. *Mahnich v. Southern S. S. Co.,* 321 U. S. 96, 88 L. Ed. 561, (a staging fell because of defective rope supplied by the mate, although sound rope was available). This obligation includes the duty of providing a proper gangway for the crew and business invitees. Many cases establish that injuries caused by defective gangplanks (even when the fall or defect is on the shore end), ship's ladders, Jacob's ladders and passages are maritime torts to which the federal maritime law fully applies. *The Admiral Peoples,* 295 U. S. 649, 79 L. Ed. 1633; *Buch v. United States,* 220 F. 2d 165; *Standard Oil Co. v. Robins*

*Dry Dock & Repair Co.,* 32 F. 2d 182; *Radoslovich v. Navigazione Libera Triestina, S. A.,* 72 F. 2d 367; *Grillo v. Royal Norwegian Government,* 139 F. 2d 237; *Pedersen v. United States,* 224 F. 2d 212; *Larsen v. United States,* 72 F. Supp. 137; *Miller v. The Sultana,* 176 F. 2d 203, 207; *Brady v. Roosevelt Steamship Co.,* 317 U. S. 575, 577, 87 L. Ed. 471; *The Max Morris,* 137 U. S. 1, 34 L. Ed. 586.

The testimony in the case before us permitted the jury to find that the regular gangway was raised much of the time on the day of the accident to allow the railroad cars to pass back and forth. It had been raised some time before Devlin arrived and, except for a lowering to permit the driver of the ambulance that came for Devlin to go aboard, remained raised until after 9:00 P. M. The upper level gangplank, consisting of ship's dunnage boards six or eight inches wide, three quarters of an inch thick and close together, had been in place and in use as a passageway from pier to ship and ship to pier since 10:00 A. M. There was no direct evidence as to who put the informal gangway in place although each defendant suggested that the other had done it. The ship's log referred to the planks as "this gangway" and added that it was not known to or authorized by any of the mates, although this self-serving declaration was refuted by the testimony. The chief mate said he had made rounds of the ship several times in the morning and several times in the afternoon and that it was his duty to notice unusual or dangerous conditions and cause them to be corrected or removed. The chief mate admitted not only that he had seen "this gangway" about 1:30 P. M. but had seen it in use and had done nothing to have it removed or to stop its use. Moreover, he himself had used the planks to go ashore and to return before Devlin arrived. The other mates were all on deck at locations where they could hardly have failed to see the informal gangway and its use. It is not seriously disputed by Farrell that if the improvised access to the ship was in itself, or otherwise under all the circumstances, an invitation to board the ship by its use, the failure to provide steps or a ladder from the end of the planks at the ship's rail to her deck constituted unseaworthiness. There was testimony, although it was vigorously disputed,

from which the jury could find that about the deck area near the rail where the planks rested, were coils of ship's line, dunnage and ship's painting stages, that, as a result of Devlin's jump, caused his injury.

The gangway watchman's duties were to check visitors to the ship. He was employed by an independent contractor but the jury could have found that he had the apparent authority to invite Devlin to use the upper gangway, as the stevedores and others had been doing, particularly since the third mate was at the watchman's side when the suggestion was made and stood silent, knowing who Devlin was and what it was proposed that he should do. A finding of apparent authority of a guard employed by an independent contractor, who invited an employee of the ship to use an unsafe means of access where a safe one was available, was held sustainable in *Paleockrasas v. Garcia,* 183 F. 2d 244 (2 Cir.). It was held further in that case that if there had been no guard, an invitation to use the unsafe facilities that offered access to the ship could have been reasonably inferred. The Court said of a baggage conveyor, next to a stairway for use of passengers: "Since this could readily have appeared the most convenient route up to the ship, defendants were under a duty to warn plaintiff and other invitees of its dangers." In *Larsen v. United States,* 72 F. Supp. 137, the officer in charge of a ship moored at a shipyard, knew that a fixed accommodation ladder could not be used and that an unsafe wooden gangway had been furnished by the shipyard, which was used by the shipyard workers and some of the crew. It was held that the ship must be charged with knowledge of the rigging of the gangway as an unsafe appliance, making the ship liable to one who fell from the gangway.

The same result was reached in *Grillo v. Royal Norwegian Government,* 139 F. 2d 237 (2 Cir.), where there was no evidence as to the defective ladder being part of the ship's gear or as to who put it in place. In *Bailey v. Texas Co.,* 47 F. 2d 153, 155 (2 Cir.), there was a safe route for a ship's crew across defendant's dock. It was partially obstructed on one occasion, making it easier to cross the dock by another route. The injured man chose the easier route and stepped on

a piece of iron that rolled and caused his injury. A defense was that a safe route was available. The Court said: "While the defendant was not bound to anticipate that seamen would wander at random about the wharf, it was charged with anticipating that they would choose the most convenient route." See also *Buch v. United States,* 220 F. 2d 165; and *Standard Oil Co. v. Robins Dry Dock & Repair Co.,* 32 F. 2d 182, both *supra.*

Farrell attempts to avoid the effect of a finding that it failed in its duty to keep the African Patriot seaworthy and in its duty of due care by saying that the control of the area in which the accident occurred had been turned over completely to Atlantic, which must be deemed solely responsible for what happened, unless Farrell had selected an incompetent stevedoring contractor. Relied on are cases in the Second Circuit in which, for a time, the "control of the area" doctrine flourished, such as *Lauro v. United States,* 162 F. 2d 32. The Supreme Court, in *Alaska Steamship Co. v. Petterson,* 347 U. S. 396, 98 L. Ed. 798, and *Rogers v. United States Lines,* 347 U. S. 984, 98 L. Ed. 1120, held the shipowner's duty as to seaworthiness to be non-delegable to any extent and would seem to have dealt the control of the area doctrine a death blow. In each of the cases the defective appliance that was the unseaworthiness causing the harm belonged to the stevedores and had been brought on board and was being operated by them when it caused the injury, and the ship was held liable. See also *Pioneer Steamship Company v. Hill,* 227 F. 2d 262. Even when the control of the area doctrine was being applied in the Second and Third Circuits, it was decided from time to time, on the facts, that there had not been complete abandonment by the shipowner of an area in which stevedores were working. *Lauro v. United States, supra,* was one such case. In *Guerrini v. United States,* 167 F. 2d 352, Judge Learned Hand said for the Court that it had not been clearly erroneous below to find "* * * that the respondent had not surrendered control of the ship to the contractor. Indeed, as to the last it appeared that an officer of the ship was on watch on that day; presumably he made his rounds, including the deck." The African Patriot's chief mate was explicit in his testi-

mony that he was in full charge of the ship and the loading and unloading, and that he made regular rounds of the decks in fulfillment of his obligation to detect and correct dangerous conditions. No room exists for the application of the doctrine urged by Farrell.

We find that Devlin produced evidence of Farrell's acts and omissions, that entitled the jury to find that it was liable to him. We find nothing in the record as a whole to show that whether Devlin was or was not contributorily negligent (and if he was, to what extent) were not questions for the jury to answer. He was told that the informal gangway was being used by the stevedores and others and invited to follow their lead. What from the effete point of view of a landsman might be regarded as a precarious crossing on a narrow passage without hand rails, would not necessarily seem dangerous or, indeed, especially unusual, to an experienced seaman, as is indicated by the use of the passage by the chief mate and, indeed, by the connotations of the terms "gang plank", "gang board", or the words "to board", as they are used before the word "ship". Moreover, it was not the crossing of the planks that did the harm. As was true of seamen of old who were made to walk the plank, the trouble came at the end. Here at the end was the jump from the rail to the deck, because there were no steps, at a place where there were dunnage, painting stages and ropes on the deck. From the lower level of the pier, as from the platform on the upper level where he began the crossing, Devlin could not see that there were no steps from the rail to the deck. As he stood on the rail, he saw evidence of cargo coming up from the hold opposite him and, afraid that he would be struck by it as it swung if he retraced his steps, he chose to jump to the deck, putting a hand on the rail and bending his leg to lessen the shock. We think the minds of reasonable men would not unite in deciding that Devlin's negligence, and only Devlin's negligence, brought about the harm he suffered.

We see no occasion to consider what Devlin's rights would have been if he had been found not to be an employee. The trial court granted Farrell automatic exceptions to the charge to the jury to the extent that it differed from Farrell's requests

for instructions. Farrell pressed below only what it has relied on in this Court, its right to directed verdicts on the grounds we have discussed. Its only request for instruction on the matter of Devlin's status, if he were not an employee, was that it be held as a matter of law that he was a bare licensee to whom Farrell owed only the duty of not intentionally injuring. Clearly, there was no basis whatever for such an instruction and it was properly refused. Farrell did not except to the issues or to the charge as given except to the extent it ignored their requests for directed verdicts. Under General Rules of Practice and Procedure, Part Three, Sec. 111, Rule 7, Farrell may not complain of the issues submitted, *Baltimore Luggage Co. v. Ligon,* 208 Md. 406, 414, nor of the parts of the charge it did not specifically except to. We find no reversible error in the trial of Devlin's case against Farrell.

Farrell says the judgment for Atlantic in Farrell's third party complaint against it resulted from the trial court's erroneous failure to charge the jury as a matter of law: (1) that Atlantic was entirely in control of the area of the ship where the accident happened; (2) that the contract between Farrell and Atlantic contained an express agreement of indemnity in favor of Farrell; (3) that the contract contained an implied agreement of indemnity. We have seen that the instruction requested on the first point was unwarranted.

On the second point, as we read the contract, there is no express agreement of indemnity. *Sinclair Prairie Oil Co. v. Thornley,* 127 F. 2d 128, and *Standard Oil Company of Texas v. Wampler,* 218 F. 2d 768, 770, relied on by Farrell, clearly state the law to be that an indemnity contract will be strictly construed against the indemnitees and will not be construed as indemnifying one against his own negligence unless such a construction is required by clear and explicit language of the contract. As we see it, all that Atlantic did in its contract with Farrell was to agree to carry workmen's compensation insurance for the unlimited protection of its employees and comprehensive liability insurance in stated amounts, to indemnify Farrell against loss or damage due to or arising out of Atlantic's operations for bodily injuries or death, sustained by any person; that is, it agreed to insure against liability on

Farrell's part for any damages attributable by the law to or as a result of its operations. As far as the matter of implied indemnity is concerned, it seems clear that the trial court dealt with the matter in submitting two issues. The first required the jury, if they found that the African Patriot was unseaworthy at the time of the accident or that there was negligence on the part of Farrell directly contributing to the accident and injury, to state whether or not there was any negligence on the part of Atlantic which directly contributed to the happening of the accident or injury. If the jury answered the first issue "yes", the second required them to say whether the negligence of Atlantic was primary or passive. The jury answered that there was no negligence on the part of Atlantic, and since the jury also found that the ship was unseaworthy and that Farrell was negligent, this would seem to dispose of the argument that Farrell was entitled to indemnification because it was without fault or because it was passively negligent, and the primary cause of the accident was Atlantic's active negligence. The submission of the issues as to Atlantic's negligence was the most feasible—and we think a proper —way of answering the question as to which Farrell claims the jury should have been instructed, in the posture the case went to the jury. Farrell did not except to the issues and cannot challenge them here for the first time. *Baltimore Luggage Co. v. Ligon, supra.*

We see no errors in the record prejudicial to Farrell.

*Judgments affirmed, with costs.*

PRESCOTT, J., dissents.