708 A.2d 298

MASS TRANSIT ADMINISTRATION

v.

CSX TRANSPORTATION, INC.

No. 121, Sept. Term, 1996.

Court of Appeals of Maryland.

April 15, 1998.

William A. Kahn, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for petitioner.

M. Natalie McSherry (Stephen B. Caplis, Whiteford, Taylor & Preston, L.L.P., on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT A. KARWACKI, Judge (retired and Specially Assigned).

RODOWSKY, Judge.

This action is one for judicial review of a decision of the Maryland State Board of Contract Appeals (BCA). Since 1979 the State has arranged for Maryland Rail Commuter (MARC) service under a series of contracts with the Baltimore and Ohio Railroad Company (B & O) and its successor. The contract in issue here provides that the State will hold the railroad harmless from "liability of every kind arising out of the Contract Service," a defined term under the contract. In the instant matter we interpret this indemnification provision and apply it to a grade-crossing collision that occurred without any fault on the part of the crew of the MARC train involved.

**I**

On October 1, 1990, B & O's successor, CSX Transportation, Inc. (CSXT), a Virginia corporation, and the Mass Transit Administration (MTA), a unit of the Maryland Department of Transportation, executed the Commuter Rail Passenger Service Agreement (the Contract) that is the subject of this action. Article I, Section 1 of the document summarizes CSXT's primary obligations under the Contract:

"(a) CSXT will provide regularly scheduled daily commuter rail service on weekdays (Monday through Friday) on its Capitol Subdivision line between Baltimore, Maryland, and Washington, DC, and on its Metropolitan and Cumberland Subdivision lines between Martinsburg, West Virginia, and Washington, DC, in accordance with Section 2 of this Agreement. This train operation, plus the maintenance of equipment, access of and use of facilities, ticket sales, and other activities required to support the operation of the train service as provided in this Article I, shall be called the 'Contract Service.' CSXT will make available its rail facilities on the above stated lines to provide the Contract Service. CSXT will operate the Contract Service in a safe and efficient manner with use of appropriate facilities and staff for management, train operations, and maintenance. . . ."

The provision of the Contract that ultimately gave rise to this appeal is Article I, Section 9(b), which provides:

"(b) Indemnification by [MTA]

"(1) [MTA] agrees to indemnify, save harmless, and defend CSXT from any and all casualty losses, claims, suits, damages or liability of every kind *arising out of* the Contract Service under this Agreement, up to a maximum amount of One Hundred Fifty Million Dollars ($150,000,-000), per occurrence, during the term of this Agreement, as excepted or limited by the terms of subsections (a), (c), (d), and (e), infra.[1] This maximum indemnification amount

---

1. Subsection 9(a) contains an indemnification by CSXT of MTA for "liability of every kind arising out of the injury to or death of CSXT

shall include any expenses for outside manpower, for legal representation and for other extraordinary expenses of handling individual claims for [MTA]....

"(2) CSXT will promptly advise [MTA] of pending claims for which [MTA] is responsible under subsection (b)(1) with estimates of settlement costs in each instance. Any proposed settlement or payment in excess of Ten Thousand Dollars ($10,000) will be submitted to [MTA] for prior approval."

(Emphasis added).

In subsection 9(d)(1) MTA "agrees to self-insure Five Million Dollars ($5,000,000) per occurrence of any casualty claim or loss for which it is responsible" under the Contract. In subsection 9(d)(2) MTA agrees, at its cost and expense, to procure and maintain "excess liability insurance coverage commonly provided by Railroad operations liability insurance" in the amount of $145 million in excess of the $5 million "self-insured retention." Subsection 9(d)(2) further provides:

"This insurance shall cover liability assumed by [MTA] under this [Contract] ... and shall name the State of Maryland and [MTA] as insured. Such insurance policies shall name CSXT as an additional insured for CSXT's operation of the Contract Service...." [2]

On November 4, 1992, CSXT contracted with Melvin Benhoff Sons, Inc. (Benhoff) to pave four, at-grade, public road crossings over CSXT's Baltimore–Washington tracks, including the Hanover Road crossing in Howard County. MTA was neither notified of the work to be done, nor was it asked to help defray the cost of the work.

---

employees while engaged in activities directly related to the provision of the Contract Service on any railroad property."

**2.** Subsection 9(c) seems intended to complement subsection 9(d) by limiting MTA's indemnification to $5 million if the claim against CSXT is covered by insurance purchased pursuant to subsection 9(d)(2).

Subsection 9(e) expressly subjects MTA's self-insurance and insurance purchase obligations to the availability of funding and budgetary appropriations.

On December 18, 1992, Benhoff commenced work on the Hanover Road crossing. The work included a Benhoff employee's operation of a backhoe on the tracks. A CSXT foreman was supervising, in accordance with certain rules promulgated by CSXT.[3] At approximately 9:10 a.m. that same day, MARC passenger train No. 244 was bound toward Baltimore. After rounding a bend just prior to the Hanover Road crossing, the MARC train struck Benhoff's backhoe and "totalled" it. No one was injured as a result of the collision. The backhoe operator left the machine on the tracks as the train approached. Whether the CSXT foreman warned the backhoe operator of the approaching train in sufficient time to move the machine off the tracks was disputed between CSXT and Benhoff. BCA, however, found that "apparently the central train dispatcher was not informed of Benhoff's presence and work plans pursuant to Rule 704. Thus, there was no notice to any train engineers or any notice to the dispatcher so that he might alert any oncoming trains of the obstruction on the track."

---

3. CSXT's *On–Track Equipment and Work Authority Rules* provide:
   "**701.** On-track equipment [OTE] operators must be examined and qualified on the Operating Rules or they must be working under the immediate (on-the-job) supervision of a person who has been examined and qualified on these rules.
   "**702.** When other than CSX on-track equipment is being operated on CSX track, a qualified employee must accompany and direct such equipment. He shall position himself to observe and give instruction to the OTE operator and he will be responsible for obtaining authorities and complying with the Operating Rules.
   "**703.** The OTE operator must be familiar with the method of train operation and the physical characteristics of the territory over which the on-track equipment is being operated, or on which work is to be performed."
   Rule 704, as summarized by BCA,
   "governs on-track equipment movement and short-term track movements. For example, a main track, signalled track or siding must not be occupied or fouled without written authority of the train dispatcher. The track foreman is required to request authority from the dispatcher to occupy the tracks, including the specific location, the limits and time of occupancy. After authority for presence on the track is received, the track must be cleared within the authorized time, and the track foreman must report that the track is clear."

Benhoff sued CSXT in the Circuit Court for Howard County seeking $40,420.25 as the value of the backhoe. Benhoff's complaint alleged CSXT's negligence to be the failure of the track foreman to warn the backhoe operator of the approaching MARC train. CSXT denied liability and asserted contributory negligence. Prior to trial, CSXT settled with Benhoff for $23,350. In the action now before us, MTA concurred that the amount of the Benhoff settlement was "reasonable."

In its claim for indemnification from MTA for the amount paid to Benhoff, CSXT asserted two grounds for indemnification. As described by MTA:

"1. The maintenance and repair work performed on the Hanover Road track crossing 'was necessary to support the operation of the train service.'

"2. The train involved in the collision was a MARC train that was engaged in Contract Service."

MTA denied CSXT's claim on three grounds: (1) the work performed by Benhoff was not part of Contract Service; (2) although a MARC train was the instrumentality that actually struck Benhoff's backhoe, there was no negligence in the rendering of that Contract Service; and (3) "to interpret Contract Section 9(b)(1) to prescribe indemnification under the circumstances presented here would be violative of a strong Maryland public policy articulated in § 5–305, *Md.Cts. & Jud.Proc.Ann.Code.*"[4]

---

4. Maryland Code (1974, 1995 Repl. Vol.), § 5–305 of the Courts and Judicial Proceedings Article (CJ) reads:

"A covenant, promise, agreement or understanding in, or in connection with or collateral to, a contract or agreement relating to the construction, alteration, repair, or maintenance of a building, structure, appurtenance or appliance, including moving, demolition and excavating connected with it, purporting to indemnify the promisee against liability for damages arising out of bodily injury to any person or damage to property caused by or resulting from the sole negligence of the promisee or indemnitee, his agents or employees, is against public policy and is void and unenforceable. This section does not affect the validity of any insurance contract, workers' compensation, or any other agreement issued by an insurer."

CJ § 5–305 has been renumbered CJ § 5–401 by Section 9, Chapter 14 of the Acts of 1997. *See* Maryland Code (1974, 1995 Repl. Vol.,

In accordance with Md.Regs.Code tit. 21, § 10.04.06 (1989) (COMAR), CSXT appealed MTA's decision to BCA which ruled in favor of MTA on summary disposition. BCA determined that, (1) the grade crossing repair undertaken by Benhoff "represented a necessary and recurring maintenance activity required of CSXT notwithstanding the existence of the instant commuter rail Contract," and, as such, was "outside the scope of the Contract with the State, provided no direct benefit to the State, and was performed without its knowledge"; and (2) "[t]he mere fact that a MARC train was innocently and fortuitously involved in the incident does not bring the incident within the ambit of the definition of '[C]ontract [S]ervice' under the Contract." BCA concluded that it need not consider whether the incident arose out of a construction contract to which CJ § 5–305 applied.

CSXT petitioned the Circuit Court for Howard County for judicial review. That court affirmed, concluding that the reasons given by BCA were supported by substantial evidence.

CSXT appealed to the Court of Special Appeals, which reversed and directed the circuit court to instruct BCA to order MTA to pay $23,350 to CSXT. *CSX Transp., Inc. v. Mass Transit Admin.*, 111 Md.App. 634, 647–48, 683 A.2d 1127, 1133 (1996). The court agreed with CSXT's contention that, notwithstanding the absence of negligence in the operation of the MARC train, "the December 18, 1992, collision arose out of 'Contract Service' because the collision involved a MARC train and 'Contract Service' specifically includes 'train operations.' " *Id.* at 640, 683 A.2d at 1129. The court also held that CJ § 5–305 was no bar because the indemnification agreement is "neither 'in, or in connection with, or collateral to, a contract or agreement relating to' construction." *Id.* at 645, 683 A.2d at 1132.[5]

---

1997 Cum.Supp.). The new CJ § 5–401 is substantially identical to its predecessor.

**5.** In the Court of Special Appeals, CSXT also argued that the claim for indemnification "arose out of Contract Service because the rehabilita-

This Court granted MTA's petition for certiorari. The petition presents the following questions:

"1. Does contractual indemnity for liability 'arising out of' work under a contract extend to liability caused solely by the negligence of the indemnitee (or its contractor) in work that is not work under the contract?

"2. Is an indemnitor's promise to indemnify for liability that was caused only by the indemnitee or its agent rendered unenforceable by [CJ] § 5–305, which voids a promise in, in connection with, or collateral to a construction agreement that purports to indemnify the promisee for its own negligence or the negligence of its agents?"

## II

On the first issue MTA's premise is that the Hanover Road work is not Contract Service, in whole or in part, and that the only Contract Service involved in the collision was the operation of the MARC train. MTA argues that the Court of Special Appeals erred in holding that the mere fact that the MARC train collided with the backhoe satisfies the "arising out of" requirement. MTA submits that more than mere "but for" causation is required to create "arising out of" indemnification liability. What that extra quantum must be is not made clear by MTA, other than that it is more than "but for" causation and that it need not reach the level of proximate causation. (Borrowing a term from the equal protection field, we shall call this notion "intermediate causation."). The operation of the MARC train did not constitute a cause of the injury, in MTA's view, because the operation of the train was not negligent; only the track maintenance was negligent. Furthermore, argues MTA, absent commercial insurance or

---

tion work being done to the crossing, and the flagging activity at the site, were in support of the track and facilities used for the MARC trains." No. 179, September Term, 1995, Appellant's Brief at 16. In view of its holding, the Court of Special Appeals found it unnecessary to address the alternative contention of CSXT. *CSX Transp.*, 111 Md.App. at 644 n. 4, 683 A.2d at 1131 n. 4.

an agreement to the contrary, Maryland law precludes indemnification for the indemnitee's own negligence.

CSXT contends that, inasmuch as operating the MARC train clearly constitutes Contract Service, Benhoff's claim "arose out of" Contract Service because the MARC train was the direct and immediate physical cause of the damage to Benhoff's backhoe. CSXT submits that an instrumentality need not be the "proximate" cause of damage, nor need there be any fault or negligence in the operation of the instrumentality to give rise to "arising out of" indemnification liability. In short, concludes CSXT, "[u]nlike a tort claim, where 'proximate cause' is the issue, in contract indemnity claims the language 'arising out of' triggers a 'causation in fact' analysis." Appellee's Brief at 21. CSXT also asserts that "there is no way to interpret the MTA's agreement to indemnify CSXT against claims arising out of Contract Service, other than as including an agreement to indemnify it for claims asserting negligence on the part of CSXT or its employees." Appellee's Brief at 30–31.

## III

Although MTA suggests to the contrary, the indemnification provision in the instant matter applies to CSXT's liability based solely on its own negligence. MTA places considerable reliance on *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 578 A.2d 1202 (1990), and *Farrell Lines, Inc. v. Devlin,* 211 Md. 404, 127 A.2d 640 (1956).

In *Heat & Power* a contractor agreed to construct a building to house the assembly used to produce certain gases. *Heat & Power,* 320 Md. at 587, 578 A.2d at 1204. During construction an employee of the contractor was injured when the building exploded, due solely to the fault of the building's owner. *Id.* at 587–88, 578 A.2d at 1204. The construction contract provided that the contractor would hold the owner harmless "from any and all loss [or] liability ... resulting from or arising out of or in connection with the performance of

this Contract by Contractor." *Id.* at 588, 578 A.2d at 1204 (emphasis omitted).

After holding that the indemnity provision was void under CJ § 5–305, we alternatively held as follows:

> "Even if [CJ § 5–305] was not applicable, [the indemnification provision] of the contract is not sufficiently clear and unequivocal to indemnify Owner against its own negligence. In *Crockett v. Crothers*, 264 Md. 222, 227, 285 A.2d 612, 615 (1971), this Court held that 'contracts will not be construed to indemnify a person against his own negligence unless an intention to do so is expressed in those very words or in other unequivocal terms.' Since the contract did not expressly or unequivocally indemnify Owner against its own negligence, the circuit court judge was correct in ruling as a matter of law that Contractor had no contractual duty to indemnify Owner."

*Id.* at 593, 578 A.2d at 1206–07.

We qualified that holding by saying:

> "The rule of construction that a 'contract will not be construed to indemnify a person against his own negligence unless an intention to do so is expressed in those very words or in other unequivocal terms,' *Crockett, supra,* does not apply to an insurance contract. The policy consideration against implying agreements to indemnify one for one's own negligence are inapplicable to liability insurance contracts which generally have as their primary purpose indemnification against one's own negligence. Also, one of the reasons why contracts to indemnify must be expressed in unequivocal terms is to protect the unwary or uninformed promisor. A liability insurer is rarely an unwary or uninformed promisor."

*Id.* at 596, 578 A.2d at 1208.

In *Farrell Lines* there was no express agreement of indemnity in the contract between the parties, a shipowner and a stevedoring company. *Farrell Lines*, 211 Md. at 421, 127 A.2d at 648.[6]

---

**6.** The relevant portion of the contract in *Farrell Lines* read as follows:

*Heat & Power* involved a promise by one who was hired to perform a service to indemnify the person for whom the service was to be performed. *Heat & Power,* 320 Md. at 587–89, 578 A.2d at 1204–05. In that relationship the person for whom the service is to be performed incurs a risk that the conduct of the person providing the service will create vicarious liability on the part of the hirer, or that the conduct may involve a non-delegable duty. Consequently, we require that there be no ambiguity and that the indemnification, if intended to embrace the sole negligence of the indemnitee, be unequivocal. *See id.* at 593, 578 A.2d at 1206–07. The indemnification provision in the instant matter, however, reverses the direction of the indemnification from that more commonly encountered. Here, the hirer of the service gives the indemnity, and the party performing the service is indemnified. It appears that the railroad industry historically has sought and obtained indemnifications. In E.R. Tan, Annotation, *Validity, Construction, and Effect of Agreement, in Connection with Real–Estate Lease or License by Railroad, for Exemption from Liability or for Indemnification by Lessee or Licensee, for Consequences of Railroad's Own Negligence,* 14 A.L.R.3d 446 (1967), the author summarizes: "The validity of an exculpatory or indemnity clause discussed in this annotation has been recognized in numerous cases." *Id.* at 453. Indeed, this Court, relying on exculpatory agreements, has sustained injunctions against the prosecution of actions at law against

---

"7. INSURANCE: The Contractor agrees to carry and include in the rates herein specified, Workmen's Compensation Insurance for the unlimited protection of its employees under State and Federal laws, also Comprehensive General Liability Insurance in the amount of $100,000.00 for death or injury of one person and $1,000,000.00 for death or injury of more than one person in a single accident. Such Comprehensive General Liability Insurance to contain a provision or endorsement to indemnify Farrell Lines Incorporated against loss for damages due to or arising out of such operations on account of bodily injuries or death sustained by any person or persons as in the policy defined and further as respects such injuries sustained by employees of the Contractor, anything in the policy to the contrary notwithstanding."

*Farrell Lines, Inc. v. Devlin,* 211 Md. 404, 127 A.2d 640 (1956), Record Extract at 306.

railroads for damages caused by the railroad's negligence. *See, e.g., Danzer & Co. v. Western Md. Ry. Co.,* 164 Md. 448, 165 A. 463 (1933); *Adamstown Canning & Supply Co. v. Baltimore & Ohio R.R. Co.,* 137 Md. 199, 112 A. 286 (1920).[7] In a more contemporary context, indemnifications of established railroads are found in agreements between the railroads and governmental entities whose light rail service shares the existing railroad right of way. *See* B.D. Morant, *Contracts Limiting Liability: A Paradox with Tacit Solutions,* 69 Tul. L.Rev. 715, 726 nn. 45 & 46 (1995).

■ In "unequivocal terms," the indemnification in the instant matter includes the liability of CSXT for its own acts or omissions. As the party rendering the commuter rail service, CSXT does not have any exposure to vicarious liability for the negligence of MTA arising out of the Contract Service; the exposure to any vicarious liability in that circumstance runs in the other direction. Under the Contract MTA indemnifies the first $5 million of CSXT's liability, arising out of Contract Service, and MTA either provides public liability insurance at its expense for CSXT's exposure from $5 million to $150 million, or MTA indemnifies CSXT for any uninsured balance of that exposure. In addition to the very words used in expressing the indemnification, the fact that it extends to $150 million clearly indicates that the parties were contemplating a possible disaster, such as a wreck of a train filled with commuters, due to CSXT's negligence.

## IV

Inasmuch as the indemnification was intended, at a minimum, to serve as liability insurance for CSXT for the first $5

---

7. In both cases the relevant provision in substance read:

" 'And the said second party releases said first party from all claims of whatsoever character for damages resulting to the property of said second party by reason of fire originating from the engines and locomotives of the first party and resulting in the burning or destruction of or injury to the property of the second party.' "

*Danzer,* 164 Md. at 452, 165 A. at 465; *see also Adamstown Canning,* 137 Md. at 201, 112 A. at 286–87.

million of CSXT's liability, it is appropriate to interpret and apply the indemnification in the same manner as liability insurance policies are interpreted and applied. That is what the Court of Special Appeals did when it relied on liability insurance cases in holding that the operation of the MARC train was a cause of the damage to the backhoe but that that operation need not be a proximate cause. *CSX Transp.*, 111 Md.App. at 643–44, 683 A.2d at 1131–32.

In public liability insurance policies, "arising out of" may introduce either coverage or exclusion provisions. *Northern Assurance Co. of America v. EDP Floors, Inc.*, 311 Md. 217, 533 A.2d 682 (1987), cited by both parties, concerned an exclusion in a commercial general liability policy for bodily injury or property damage " 'arising out of the ownership, maintenance, operation, use, loading or unloading of . . . any automobile.' " *Id.* at 225, 533 A.2d at 686. The underlying claim was asserted by an employee of a customer of the insured. *Id.* at 220, 533 A.2d at 683–84. The claimant was injured while assisting the insured's driver in unloading a delivery from the insured's truck—assistance that was required because the driver's helper, although present, was either inebriated or hung over. *Id.* When the helper threw a lever that caused the hydraulic lift at the rear of the truck to move, part of the load fell on the claimant. *Id.* at 220, 533 A.2d at 684. In his suit the claimant alleged, in addition to vicarious liability of the insured, that the insured negligently hired, supervised, and retained the helper. *Id.* We held that there was no coverage on the following rationale:

> "The words 'arising out of' must be afforded their common understanding, namely, to mean originating from, growing out of, flowing from, or the like. While these words plainly import a causal relation of some kind, read in context, they do not require that the unloading of the truck be the sole 'arising out of' cause of the injury; they require only that the injury arise out of the unloading of the vehicle. Therefore, if [claimant's] bodily injury arose out of EDP's employee's unloading of the truck, then that injury is excluded from coverage. This is so regardless of whether the injury

may also be said to have arisen out of other causes further back in the sequence of events, such as the employee's consumption of alcohol, or the employer's negligent failure to supervise the employee. The exclusion also applies irrespective of the theory of liability by which [claimant] seeks redress for his injury, as the policy exclusion is not concerned with theories of liability. Rather, the policy insures against certain types of damages or injuries, specifically excluding injuries arising out of the operation, use or unloading of EDP's vehicle.

"As we see it, the language in the exclusionary clause clearly focuses the 'arising out of' inquiry on the instrumentality of the injury, *i.e.*, upon the truck and its unloading. When, as here, there is no ambiguity in the policy exclusion, the first principle of construction of insurance policies in Maryland requires that we apply the terms of the contract as written. To apply either a proximate or concurrent cause analysis in the interpretation of the policy exclusion, as EDP urges, would severely strain its plain import and would result in coverage being provided, contrary to the intention of the parties, for acts inseparably associated with the operation, use or unloading of the truck."

*Id.* at 230–31, 533 A.2d at 688–89 (citations omitted).

Here MTA argues that negligence on the part of CSXT, further back in the chain of causation, caused the accident, either by failure to warn the backhoe operator, failure to warn the oncoming MARC train, or failure to alert the dispatcher that the work on the crossing was being done. Those omissions do not diminish the fact that the damage to the backhoe arose out of the collision with the MARC train, just as the insured's negligence in *EDP Floors* in allowing the helper to go out on the delivery truck did not diminish the fact that the personal injuries in that case arose out of unloading the truck.

*EDP Floors* has been favorably cited in other "arising out of" automobile use exclusion cases where the claimant alleged that the insured negligently supervised or trained the auto-using tortfeasor. *See, e.g., Scarfi v. Aetna Cas. & Sur. Co.,*

233 N.J.Super. 509, 515, 559 A.2d 459, 463 (1989) ("[T]he underlying action for negligent hiring or training was triggered only when [the claimant] was injured as a result of the [automobile accident]."); *McPherson v. Michigan Mut. Ins. Co.*, 310 S.C. 316, 320, 426 S.E.2d 770, 772 (1993) ("[W]ithout the [operator's] allegedly negligent operation of the [automobile], there is no link by which [the owner's] negligence can be independently connected to [the claimant's] injuries."); *Taylor v. American Fire & Cas. Co.*, 925 P.2d 1279, 1283 (Utah Ct.App.1996) ("[T]he acts complained of could not have resulted in injury but for the use of the automobile."), *cert. denied*, 936 P.2d 407 (Utah 1997).

An argument analogous to that of MTA in the instant matter was rejected by Judge Kaufman in *Chesapeake & Potomac Tel. Co. v. Allegheny Constr. Co.*, 340 F.Supp. 734 (D.Md.1972). In that case, the telephone company's insurer under a manufacturer's and contractor's liability policy denied coverage for a personal injury damage suit brought by the employee of a contractor engaged by the telephone company to replace old telephone poles. *Id.* at 736–38. After the claimant had climbed a pole and attached himself to it, the pole broke beneath the surface of the earth and toppled the claimant to the ground. *Id.* at 737. Judge Kaufman interpreted the policy to insure against liability for injury "arising out of" operations performed by the contractor. *Id.* at 741. Rejecting the insurer's argument that the pre-contract negligence of the telephone company was alleged to be the cause of the accident so that the injury could not arise out of contract operations, Judge Kaufman held that " 'but for' the operations having been conducted, [the claimant] would not have been injured during the course of them." *Id.* at 742; *see also Township of Springfield v. Ersek*, 660 A.2d 672 (Pa. Commw.Ct.1995), *appeal denied*, 544 Pa. 640, 675 A.2d 1254 (1996).

*National Indemnity Co. v. Ewing*, 235 Md. 145, 200 A.2d 680 (1964), involved a coverage provision for bodily injury caused by accident and arising out of the ownership, maintenance, or use of an automobile. There we concluded that "it

has generally been held that, while the words import and require a showing of causal relationship, recovery is not limited by the strict rules developed in relation to direct and proximate cause." *Id.* at 149, 200 A.2d at 682. In that case the driver of the insured vehicle and his passenger, both of whom were inebriated, were traveling late at night on a rural road during a snowstorm. *Id.* at 147–48, 200 A.2d at 681. When the vehicle went off the road, skidded along the shoulder, and ultimately struck a utility pole, the passenger was thrown from the car, but was not injured. *Id.* A passing motorist stopped and rendered assistance, including locating the passenger sitting on a snowbank. *Id.* at 148, 200 A.2d at 681. While the host driver was assisting his passenger in walking down the highway to re-enter the insured vehicle, the passenger was struck and injured by a third car that was traversing the highway some twenty-five minutes after the first accident. *Id.* We affirmed a declaratory judgment, entered after a jury trial, that the injuries to the claimant passenger arose out of the host driver's use of the insured automobile. *Id.* at 147, 200 A.2d at 680–81. Although bound by the jury's finding that the injuries to the claimant in the second accident were proximately caused by concurrent negligence on the part of the host driver and the third motorist, the Court found that there was a sufficient nexus of cause and effect between the use of the insured automobile in the first accident and the injuries to the claimant in the second accident. *Id.* at 150–51, 200 A.2d at 682–83. The connection was that "the negligent use of the [insured] car created a situation where [the claimant] was subjected to the risk of injury." *Id.* at 150–51, 200 A.2d at 683.

*Ewing* relied, *inter alia,* upon *Schmidt v. Utilities Ins. Co.,* 353 Mo. 213, 182 S.W.2d 181 (1944), involving coverage under an automobile liability policy for a pedestrian fall-down accident. *Schmidt,* 182 S.W.2d at 181–82. The claimant had tripped over triangular wooden blocks that a coal company's employees had left on the sidewalk when they had completed deliveries of coal. *Id.* at 182. The blocks had been used as a ramp, rising from street level to the top of the curb, to allow

the insured delivery trucks to back up on the sidewalk to the customer's coal chute. *Id.* Although the negligent disposition of the blocks could be viewed as the proximate cause of the claimant's injuries, "the acts of disposition grew out of or arose from the use of the trucks, as trucks." *Id.* at 184.

The insurance treatises support the view articulated in *EDP Floors* and in *Ewing* that the words "arising out of" mean "originating from, growing out of, flowing from, or the like." *See, e.g.,* 6B J.A. Appleman & J. Appleman, *Insurance Law and Practice* § 4317, at 360–63 (R.B. Buckley ed., 1979) (in the context of automobile insurance, the words "arising out of" have "broader significance than the words 'caused by', and are ordinarily understood to mean originating from, incident to, or having connection with the use of the vehicle"); 12 G.J. Couch, *Couch Cyclopedia of Insurance Law* § 45:61, at 294 (2d ed. 1981) ("[T]he words 'arising out of' ... generally mean 'originating from,' 'growing out of,' or 'flowing from.'"); 1 R.H. Long, *The Law of Liability Insurance* § 1.22, at 1–57 (1972) ("The phrase 'arising out of' is not to be construed to mean 'proximately caused by.' ... The words 'arising out of' mean causally connected with, not 'proximately caused by' use.").

In its opinion in this case the Court of Special Appeals also relied upon *Faber v. Roelofs,* 311 Minn. 428, 250 N.W.2d 817 (1977) (en banc), where coverage turned on whether the bodily injury was one "arising out of" the ownership, maintenance, or use of the insured school bus. *Faber,* 250 N.W.2d at 819–20. The school bus was owned by a private contractor whose liability policy named the school district as an additional insured. *Id.* at 819. An elementary school pupil had been killed when he ran into the street alongside the bus, slipped, and fell under the wheels. *Id.* There was no negligence on the part of the bus driver or owner, but the school district had been found to be concurrently negligent in establishing the bus route and the boarding and embarking procedures. *Id.* at 819–20. The court rejected the argument that, because of the absence of negligence on the part of the bus operator or owner, the accident was not one "arising out of" the use of the

school bus. *Id.* at 822–23. Rather, because the pupil "was run over by the insured vehicle [t]he causal relation [was] present." *Id.* at 823.

*See also American Family Mut. Ins. Co. v. Shelter Mut. Ins. Co.,* 747 S.W.2d 174 (Mo.Ct.App.1988) (where claimant tripped in ruts in driveway of business premises while assisting the driver of the business's insured truck to carry an automobile transmission that had been unloaded from the truck twenty to thirty-five feet away, claimant's injury arose out of the use of the insured vehicle).

MTA alternatively contends that, even if proximate causation is not required for "arising out of" coverage, something more than "but for" causation is required. From among the decisions of this Court MTA selects two as illustrations of "intermediate causation," *Ewing, supra,* and *Frazier v. Unsatisfied Claim & Judgment Fund Bd.,* 262 Md. 115, 277 A.2d 57 (1971). MTA's argument attempts to read into these cases a meaning that is not there. In *Ewing* this Court simply rejected proximate cause as a predicate for "arising out of" coverage, without mentioning any need for some lesser fault. *Ewing,* 235 Md. at 149, 200 A.2d at 682.

The flaw in MTA's argument is clearly exposed in *Frazier.* There the claimants against the former Unsatisfied Claim and Judgment Fund (the Fund) were a mother and her child, age five at the time of the accident. *Frazier,* 262 Md. at 116, 277 A.2d at 58. Under the Fund law one basis for recovery against the Fund was a personal injury that "arises out of" the use of an unidentified motor vehicle. *Id.* at 117, 277 A.2d at 58. While the mother had been driving an open convertible with her child in the back seat, an unidentified motorist, driving in the opposite direction, threw a lighted cherry bomb or firecracker into the back seat of the convertible. *Id.* at 116, 277 A.2d at 58. The projectile exploded, the child cried, the mother lost control of the car, and the car hit a tree. *Id.* This Court, drawing on automobile liability coverage cases, held that the Fund was answerable because "the injuries

under the facts of this case did arise out of the ... use of an unidentified motor vehicle." *Id.* at 119, 277 A.2d at 59. There was no fault in the driving, *per se,* of the unidentified motor vehicle—only in what the unidentified motorist did while driving. We fail to see how *Frazier* supports the need for "intermediate causation" in the operation of the MARC train before the collision can be said to "arise out of" the train's operation.

Contracts made by promisors, other than commercial insurers, to indemnify for loss "arising out of" certain activity of the indemnitor are interpreted and applied in the same manner as contracts made by commercial insurers. Here, Contract Service is an activity of MTA, and we have demonstrated (*see* Part III, *supra*) that the promise to indemnify includes liability for the sole negligence of CSXT. Consequently, so long as the liability of CSXT arises out of Contract Service, it matters not that MTA is without fault.

The indemnification agreement at issue in *O'Connor v. Serge Elevator Co.,* 58 N.Y.2d 655, 458 N.Y.S.2d 518, 444 N.E.2d 982 (1982) (per curiam), *amended on other grounds by* 58 N.Y.2d 799, 459 N.Y.S.2d 266, 445 N.E.2d 649, *and reargument denied,* 58 N.Y.2d 824, 459 N.Y.S.2d 1030, 445 N.E.2d 657 (1983), involved the construction of a thirty-two-story building. *O'Connor,* 458 N.Y.S.2d at 519, 444 N.E.2d at 983. The drywall subcontractor, in its subcontract, agreed to indemnify the general contractor against liability "includ[ing] personal injuries 'arising out of the work which is the subject of this contract,' regardless of whether caused by [the subcontractor, the general contractor], or others." *Id.* An employee of the subcontractor, while leaving his workplace for lunch, had been injured by an elevator then being installed by the elevator subcontractor. *Id.* Reversing a judgment for the drywall subcontractor on the general contractor's claim against it for indemnification, the Court of Appeals of New York said:

"The [sub]contract could not be performed, of course, unless [the drywall subcontractor's] employees could reach and leave their workplaces on the job site. The instant injuries,

occurring during such a movement, must be deemed as a matter of law to have arisen out of the work. Thus, [the general contractor] was entitled to indemnity from [the drywall subcontractor]."

*Id.* Similarly, the damage to the backhoe arose out of CSXT's Contract Service.

The following cases are to the same effect: *Indemnity Ins. Co. of N. Am. v. Koontz–Wagner Elec. Co.*, 233 F.2d 380 (7th Cir.1956) (applying Indiana law) (under contract for removal of light fixtures in owner's manufacturing plant, providing that contractor indemnify owner for liability "growing out of the performance of this order," contractor must indemnify owner for injuries to contractor's employees incurred when owner's employee drove a lift truck into scaffolding on which contractor's employees were standing while removing fixtures); *Myers v. Burger King Corp.*, 618 So.2d 1123 (La.Ct.App.) (under contract for renovation of owner's fast food restaurant, providing that contractor promised to maintain liability insurance to protect owner from any claims which "arise from" the contractor's operations, contractor breached promise by failing to obtain insurance, and contractor is liable for damages payable to contractor's employee for injuries suffered due to owner's negligent installation of a menu board that struck contractor's employee while employee was working on it), *writ denied*, 629 So.2d 348 (1993); *Vitty v. D.C.P. Corp.*, 268 N.J.Super. 447, 633 A.2d 1040 (App.Div.1993) (under contract to provide towing and wrecking services on the Garden State Parkway, providing that contractor indemnify state highway authority for liability "arising out of this License," contractor must indemnify state highway authority for death of contractor's employee who, while on duty in tow truck standing at crossover, was killed when struck by a drunk driver whose car allegedly became airborne as a result of defective design of highway median); *Wallace v. Sherwood Constr. Co.*, 877 P.2d 632 (Okla.Ct.App.1994) (mem.) (under subcontract for hauling dirt during construction of turnpike, providing that hauling subcontractor indemnify general contractor for all damages "arising out of or resulting from subcontractor's performance

of the work required by the subcontract," subcontractor must indemnify general contractor for injuries to subcontractor's sub-subcontractor caused fifty percent by general contractor's negligence and fifty percent by claimant's contributory negligence).

In the instant matter, were we to interpret the contractual indemnification by MTA of CSXT more narrowly than a liability insurance policy, then CSXT would have less protection against the risk of liability up to $5 million than it would have under a liability policy in the exposure range of $5 million to $150 million. That was not the intention of the parties to the Contract.

## V

MTA argues that, if the indemnification provision in the Contract applies to the facts of the matter at hand, then the indemnification is void under CJ § 5–305, set forth in full in note 4, *supra*. The obvious obstacle that the argument faces is that the Contract relates to commuter rail service and not to construction work. MTA's response to that obstacle is that the promise to indemnify is also unenforceable if the promise is "in connection with or collateral to, a contract or agreement relating to the construction ... of a ... structure." MTA submits that when the indemnification promise in the Contract is applied to a loss that is caused by the negligence of the CSXT foreman who was overseeing work under the CSXT–Benhoff contract, then the indemnification is "in connection with" a construction contract. The Court of Special Appeals refused to give the statute so expansive a reading, agreeing with the observation of the United States Court of Appeals for the Fourth Circuit in *Brown v. Baltimore & Ohio R.R. Co.*, 805 F.2d 1133 (1986), that the General Assembly did not intend a reading so expansive as to reach, as presented in *Brown*, hold harmless provisions in license and easement agreements given by railroads for access over and under their rights of way. *Id.* at 1142.

■ We agree with the Court of Special Appeals that CJ § 5–305 is not to be given so expansive a reading that it is applicable to the facts of the instant matter. In doing so we shall assume, *arguendo,* that the CSXT–Benhoff contract is a contract "relating to the construction, alteration, repair, or maintenance of a building, structure, appurtenance or appliance." Nevertheless, the plain or ordinary meaning of "in connection with or collateral to" in the context of CJ § 5–305 would embrace supplemental, amendatory, or side agreements relating to the construction contract and made between the parties to the construction contract. Further, CJ § 5–305 possibly could embrace contracts between third parties and one or the other of the parties to the construction contract where such a third-party contract is necessary to the performance by a party to the construction contract of that party's obligations under the construction contract.

The Contract was executed October 1, 1990, succeeding agreements between the railroad and the State for commuter rail service dating back to 1979. CSXT's "construction" contract with Benhoff was not made until November 1992. Inasmuch as a railroad is an operating unit, *see* Maryland Code (1986, 1994 Repl.Vol.), § 8–108 of the Tax–Property Article, some connection can be found between almost any two contracts of a railroad that are to be performed during the same period of time. We do not believe, however, that the General Assembly intended so attenuated a connection.

A decent respect for the freedom of sophisticated parties contractually to establish the rules governing their business relationship compels the conclusion that the General Assembly intended contracting parties to be able to determine, when they contract, whether CJ § 5–305 applies to their agreement. On October 1, 1990, the Contract was not one for construction, and we hold that it did not become a construction contract because of the collision between a MARC train and the backhoe. Construing CJ § 5–305 as MTA proposes would retroactively void the indemnification of the State by CSXT, as to claims of CSXT's employees against MTA, and retroactively void the indemnification of CSXT by the State. Were the

General Assembly to enact a statute that expressly and retro-actively voided pre-existing contracts of indemnity, weighty constitutional issues would be raised. We do not interpret CJ § 5-305 to operate in the same fashion based on a temporary interface of forces.

MTA asserts that there is a contradiction in the analysis by the Court of Special Appeals when it said: "Although the collision may have arisen out of the construction contract between CSXT and Benhoff, CSXT's right to indemnification does not arise out of a construction contract." *CSX Transp.,* 111 Md.App. at 645, 683 A.2d at 1132. As the Court of Special Appeals made plain, and as we attempted to make plain in Part IV, *supra,* the chain of causation "arising out of" the Benhoff contract, *i.e.,* omission by the CSXT foreman at the Hanover Road crossing, is a proximate cause of the backhoe's destruction, while the chain of causation "arising out of" Contract Service under the Contract is physical causation or causation in fact. The latter satisfies contractual indemnity while the former is required for tort liability.

## VI

For the reasons above set forth the Circuit Court for Howard County erred in its judicial review of the BCA determination. That court considered that BCA applied cor-rect legal principles to facts supported by substantial evidence. BCA, however, used an incorrect legal standard. It applied the indemnification provision based on the proximate cause of the collision with the backhoe, without recognizing that the "arising out of" promise in the Contract's indemnification of CSXT was a broader concept.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITION-ER, MASS TRANSIT ADMINISTRATION.*

Dissenting opinion by ELDRIDGE, J., in which CHASANOW and RAKER, JJ., join.

ELDRIDGE, Judge, dissenting:

As the opening sentence of the majority's opinion points out, this is an action for judicial review of a decision by the Maryland State Board of Contract Appeals. Nevertheless, the majority accords no deference or respect whatsoever to the administrative agency's interpretation of the contract. In light of the Board's expertise in the field of public contracts, its interpretation of the contract should be accorded weight and accepted unless unreasonable. Moreover, even if the contract interpretation issue were before us entirely de novo, the majority's interpretation is contrary to the meaning that a reasonable person would have attributed to the contract language at issue.

MTA entered into a contract with CSXT whereby CSXT would provide commuter train service which MTA otherwise would have provided itself. Under the contract, CSXT would operate MARC commuter passenger train service for MTA on CSXT-owned lines between Baltimore and Washington, D.C. and between Washington, D.C. and Martinsburg, West Virginia. The services to be provided by CSXT included the "train operation, plus the maintenance of equipment, access of and use of facilities, ticket sales, and other activities required to support the operation of the train service." MTA, for its part, agreed to "indemnify, save harmless, and defend CSXT from any and all casualty losses, claims, suits, damages or liability of every kind arising out of the Contract Service." The critical question in this case revolves around the proper interpretation of the phrase "arising out of" contained in the indemnity provision. If CSXT's liability arose out of contract services, then CSXT is entitled to indemnification. If, however, CSXT's liability did not arise out of contract services, then CSXT is not entitled to indemnification.

As the Board read the indemnity clause, and as I believe any reasonable person would understand it in the context of this contract, MTA agreed to indemnify CSXT for any liability which would have been MTA's had MTA been engaged in the contract services itself. That is, MTA asked CSXT to do its

work, and agreed that any liability incurred by CSXT because of its performance of MTA's work, would be paid for by MTA. Here, CSXT incurred liability not because of its performance of the contract services (operating the MARC train), but because of its own negligence in conducting independent and unrelated construction activities on its own tracks. The tracks were used primarily for trains other than MARC trains. No reasonable person would have thought that MTA had agreed to indemnify CSXT in such a situation. Therefore, I would reverse the judgment of the Court of Special Appeals and affirm the judgment of the Circuit Court.

The majority bases its decision on its conclusion that the phrase "arise out of" means nothing more than simple "but for" causation. Thus, CSXT's liability "arose out of" contract services, according to the majority, because, but for the MARC train colliding with the backhoe, the backhoe would not have been damaged. Such a sweeping interpretation of the phrase "arise out of," as applied to the facts of this case, is unreasonable.

There should be more of a nexus between contract services and CSXT liability than simple "but for" causation before the indemnity provision is triggered. If not, then MTA could be required to indemnify CSXT for a myriad of liabilities in no way closely related to the provision of commuter rail service by CSXT for MTA. Consider a hypothetical example. Suppose that CSXT has a limited number of engineers qualified to operate its own freight trains and/or MARC trains. In addition, suppose that, on a given day, CSXT experiences a shortage of qualified engineers available to work, so that CSXT must either cancel some of its freight trains or MARC trains, or else run them with unqualified engineers. Confronted with this dilemma, and not wanting to breach its contract to provide MARC train services, CSXT decides to take qualified engineers that were assigned to freight trains and assign them to MARC trains, so that the MARC trains are fully staffed with qualified engineers, while some of the freight trains are running with unqualified engineers. As a result of the negligent operation of one of the freight trains by an unqualified

engineer, an accident occurs between a CSXT freight train and the backhoe. Under the majority's analysis, MTA would be required to indemnify CSXT for the destruction of the backhoe because, "but for" the provision of contract services, CSXT would not have been running its freight train with an unqualified engineer, and the collision would not have occurred.

Of course, in the above hypothetical, one could argue that the accident was more directly caused by factors other than the provision of MTA contract services, such as the negligent operation of the freight train, CSXT's hiring decisions, profit motivations, etc. But, under the majority's logic, none of that matters. All that is required is that the provision of MTA contract services be one out of innumerable "but for" causes. In the above hypothetical, the provision of contract services was a "but for" cause of the accident. But for CSXT's provision of MTA contract services, CSXT would not have removed personnel from its freight trains, the freight trains would not have been run with unqualified engineers, and the accident would not have occurred. Therefore, the contract services would be a "but for" cause of the accident and MTA would be required to indemnify CSXT for its liability in that accident. Of course, no reasonable person reading the indemnity agreement would think that it should apply under such facts, and yet that would be the result under the majority opinion. A straightforward "but for" analysis is simply too broad in this context.

Furthermore, I do not believe that the cases relied upon by the majority for its conclusion that "arise out of" means "but for" causation compel the use of a simple "but for" analysis in this case. The majority relies on three decisions of this Court to support its conclusion that MTA must indemnify CSXT: *Northern Assurance Co. v. EDP Floors, Inc.*, 311 Md. 217, 533 A.2d 682 (1987); *Frazier v. Unsat. C & J Fund Bd.*, 262 Md. 115, 277 A.2d 57 (1971); *National Indemnity v. Ewing*, 235 Md. 145, 200 A.2d 680 (1964). None of these cases supports the result reached by the majority today.

*EDP Floors* involved an exclusion from general business liability insurance which excluded from coverage, *inter alia*, bodily injury arising out of the loading or unloading of any motor vehicle. The policy defined loading or unloading to mean the handling of property: (1) after it is moved from the place where it is accepted for movement into or onto a motor vehicle; (2) while it is in or on a motor vehicle; (3) while it is being moved from a motor vehicle to the place where it is finally delivered. Two EDP employees, a driver and a helper, were delivering a load of floor tile to a jobsite. Unfortunately, the helper was apparently inebriated and unable to assist the driver in the delivery. Therefore, the driver obtained assistance from some employees of the customer. While they were unloading the tile from the truck, the intoxicated helper apparently activated the lift at the rear of the truck, causing floor tile to fall onto one of the customer's employees assisting in the unloading. The injured employee later sued EDP, asserting vicarious liability for the helper's negligence and direct liability for negligent hiring, retention and supervision. EDP sought coverage for the incident under its general business liability insurance. Its insurer denied coverage, however, based on the exclusion for bodily injury arising out of loading/unloading motor vehicles. EDP asserted that the exclusion did not apply to the complaints of negligent hiring, retention and supervision because the separate negligence of EDP itself should be viewed as the proximate cause of the injuries. Alternatively, it argued that EDP's own negligence and the negligence of its employee should be viewed as concurrent causes of the injuries, and the exclusion would only apply if the employee's negligence in unloading was the sole cause. This Court rejected both of EDP's arguments and held that the exclusion did apply because the injuries arose out of the unloading of the vehicle.

Contrary to the conclusion reached by the majority today, however, in *EDP Floors* the Court did not find that the injury arose out of the unloading of the truck based on a "but for" analysis. In fact, the Court specifically *rejected* using any type of causation analysis to determine whether the parties

intended a particular type of incident to be covered or not. Instead, the Court in *EDP Floors* relied upon an earlier case, *Aragona v. St. Paul Fire & Mar. Ins.*, 281 Md. 371, 378 A.2d 1346 (1977), which also involved a question of insurance policy interpretation. There, a lawyer was sued by former clients whose funds had been misappropriated by the lawyer's partner. The lawyer was found negligent for failing to discover his partner's activities. The lawyer's malpractice insurance excluded from coverage " 'any dishonest, fraudulent, criminal or malicious act or omission of the Insured, any partner or employee....' " 281 Md. at 372, 378 A.2d at 1347. The *EDP Floors* opinion discussed the *Aragona* case as follows (311 Md. at 228–229, 533 A.2d at 688):

> "We concluded [in *Aragona*] that this insurance policy did not cover Myers' negligent failure to discover his partner's misappropriations. Finding no ambiguity in the policy language, we defined the issue as 'whether, in view of the plain language of the policy, the exclusionary clause applies where, as here, one of several causes contributing to the loss was not within the exclusion.' ... After reviewing several cases from other jurisdictions, we noted that many courts expressed the grounds of their decisions in terms of proximate, efficient, dominant, or direct causation; if such causes were within the exclusion, these courts held, the policy did not cover the loss.... We noted further that, employing the language of proximate causation, the dishonest act of Myers' partner could be characterized as the direct and precipitating cause of the loss and Myers' negligence as merely a remote and indirect cause.... We made clear, however, that our decision holding the policy exclusion applicable rested finally, not on a proximate cause analysis, but rather on our judgment that, *construing the language in the insurance contract as a whole,* the parties intended any loss resulting from any dishonest or criminal act of the insured's partner to be excluded from coverage.... In fact, we stated a caveat *concerning the indiscriminate use of principles of causation:*

'[T]he terms of the policy determine the reach and extent of its coverage. In this connection, *principles of causation will not be applied to defeat the intent of the parties, as manifested in the insurance contract;*

\* \* \* '

"We thus cautioned in *Aragona* against the inappropriate use of principles of causation. . . ." (Emphasis added).

In *EDP Floors,* then, far from adopting a "but for" approach to the interpretation of the phrase "arise out of" in a contract, we specifically *rejected* relying on a causation-based analysis which would defeat the intent of the parties. Rather, we stated the test in terms of inseparable association (*EDP Floors, supra,* 311 Md. at 231, 533 A.2d at 689) (emphasis added):

"To apply either a proximate or concurrent cause analysis in the interpretation of the policy exclusion, as EDP urges, would severely strain its plain import and would result in coverage being provided, contrary to the intention of the parties, *for acts inseparably associated with* the operation, use or unloading of the truck."

Thus, the exclusion applied because the injury to the customer's employee arose out of acts inseparably associated with the unloading of the truck.

The activity in the present case, which is analogous to the unloading of the truck in *EDP Floors,* is CSXT's construction work on its tracks at a grade crossing. The negligent act was "inseparably associated with" the construction work on CSXT's tracks. It was not, in the language of the *EDP Floors* opinion, "inseparably associated with" the MARC train operations. It was in the course of CSXT's construction work on the tracks that a CSXT employee, not involved in operating a MARC train, committed the negligent act. This was far removed from the MARC train operations. It was simply fortuitous that the MARC train happened to arrive on the scene of the construction work. The same injury, resulting from the same negligent act, would have taken place whether

it was a MARC train, a CSXT freight train, or an AMTRAK passenger train coming around the bend.

The next opinion of this Court invoked by the majority to support its reliance on a "but for" analysis is *National Indemnity v. Ewing, supra,* 235 Md. 145, 200 A.2d 680. In that case, a passenger was thrown from an automobile, but was not injured, when the vehicle skidded off the road as a result of the negligence of the driver who was intoxicated. About twenty-five minutes later, the passenger was injured when he was struck by a passing motorist as the driver was assisting him to walk down the road to the driver's vehicle. The question presented was whether the injuries to the passenger arose out of the use of the driver's automobile. The Court concluded that the injuries did arise out of the use of the driver's automobile because *"the negligent use of the car created a situation* where [the passenger] was subjected to the risk of injury. . . ." 235 Md. at 150–151, 200 A.2d at 683 (emphasis added).

While *Ewing* would support a holding that the destruction of the backhoe in the instant case arose out of CSXT's construction activities, it does not support the proposition that it arose out of the operation of the MARC train. It was the negligence of CSXT in carrying out the construction activities that, in the words of *Ewing,* "created a situation where [the backhoe] was subjected to the risk of injury." The operation of the MARC train did not create this "situation." As found below, and as conceded by CSXT, there was no negligence at all in the operation of the MARC train. The operation of the MARC train did not create the situation subjecting the backhoe to the risk of injury, and the injury to the backhoe did not arise out of CSXT's operation of the MARC train.

The majority opinion misconstrues *Ewing* when it states that, "[i]n *Ewing* this Court simply rejected proximate cause as a predicate for 'arising out of' coverage, without mentioning any need for some lesser fault." (Majority opinion at 19). First, like the opinion in *EDP Floors,* this Court in *Ewing* did not "simply" reject a proximate causation analysis, but the

Court rejected placing reliance on any form of strict causation analysis, saying (235 Md. at 149, 200 A.2d at 682, emphasis added):

> "[W]hile the words ['arise out of'] import and require a showing of causal relationship, recovery is not limited by the strict rules developed in relation to *direct and proximate cause.*"

Second, contrary to the majority's characterization of the holding in *Ewing,* this Court did base its conclusion that the injuries arose out of the use of the automobile on a finding of fault in the operation of that automobile. In *Ewing* the Court determined that the injuries arose out of the use of the automobile because "the *negligent use* of the car created a situation where [the passenger] was subjected to the risk of injury," 235 at 150–151, 200 A.2d at 683, emphasis added. Therefore, *Ewing* does not support the majority's conclusion that a simple "but for" causation analysis is appropriate in the present case.

Nor does *Frazier v. Unsat. C & J Fund Bd., supra,* 262 Md. 115, 277 A.2d 57, the only other decision of this Court relied on by the majority, support the majority's position in this case. In *Frazier,* a mother was driving an open convertible with a child in the back seat. An unidentified motorist, driving in the opposite direction, threw a firecracker into the back seat of the convertible, causing the baby to cry and the mother to lose control of the convertible, resulting in a wreck. The mother brought a claim against the Unsatisfied Claim and Judgment Fund because the driver of the other car was unknown, and resolution of the claim turned on whether the injuries sustained in the accident arose out of the use of the unidentified motor vehicle. The majority opinion today, referring to *Frazier,* states that "[t]his Court, drawing on automobile liability coverage cases, held that the Fund was answerable because 'the injuries under the facts of this case did arise out of the ... use of an unidentified motor vehicle.' ... There was no fault in the driving, *per se,* of the unidentified motor vehicle— only in what the unidentified motorist did while driving." (Majority opinion at 316–317, 708 A.2d at 307).

The majority's analysis of *Frazier* is contrary to this Court's actual reasoning in that case. In *Frazier*, this Court did not "draw[ ] upon automobile liability coverage cases." On the contrary, the automobile liability coverage cases cited by the Court in *Frazier* actually suggested a holding that the injuries did not arise out of the use of an unidentified motor vehicle. *See McDonald v. Great American Insurance Company*, 224 F.Supp. 369 (D.R.I.1963) (no coverage afforded by automobile insurance policy for injuries sustained when firecracker thrown from automobile); *Speziale v. Kohnke*, 194 So.2d 485 (La.App.), *writ refused*, 250 La. 469, 196 So.2d 534 (1967) (same); and other cases cited in *Frazier*. Instead of drawing upon these automobile liability coverage cases, this Court specifically rested its decision in *Frazier* on the remedial nature of the Fund and the interest of protecting innocent victims. *Frazier, supra*, 262 Md. at 118, 277 A.2d at 59. Thus, this Court concluded that, "for [the] purposes of determining whether leave to sue the Board should have been granted," 262 Md. at 119, 277 A.2d at 59, the injuries arose out of the use of an unidentified motor vehicle. This Court's holding in that limited context should not influence our decision in the case *sub judice*. Furthermore, nothing in the *Frazier* opinion supports the majority's contention that a simple "but for" test is all that is required.

The cases cited by the majority demonstrate that, in interpreting indemnity language and exclusions, this Court has rejected the use of simple causation analysis. As we stated in *EDP Floors, supra*, 311 Md. at 229, 533 A.2d at 688, quoting *Aragona v. St. Paul Fire & Mar. Ins., supra*, 281 Md. at 379, 378 A.2d at 1351, " 'principles of causation will not be applied to defeat the intent of the parties, as manifested in the insurance contract....' " The majority today is improperly using principles of "but for" causation to defeat the intent of the parties as manifested in the indemnity provision.

In the contract, MTA agreed to indemnify CSXT for all "casualty losses, claims, suits, damages or liability of every kind arising out of the Contract Service." The majority states that this promise includes liability for the sole negligence of

CSXT. With this I agree. Nevertheless, I do not believe that MTA agreed to indemnify CSXT for any and all of CSXT's negligent acts regardless of whether that negligence was in relation to the Contract Service. That is, MTA agreed to indemnify CSXT for CSXT's own negligence in the provision of Contract Service, not in conducting unrelated construction activities on CSXT's tracks. That is what an objective, reasonable person would understand the parties' intent underlying the indemnification agreement to be, and that is what the Board of Contract Appeals found to be the intent of the parties. I agree with the Board's interpretation.

Furthermore, even if we might be inclined to reach a different interpretation than the Board's, we should give deference to the interpretation reached by the Board. The Court of Special Appeals stated that "[t]he Board's decision was a purely legal determination of the meaning of the contractual term 'arising out of,'" and that therefore the court would "accord no deference to the Board's findings." 111 Md.App. 634, 640, 683 A.2d 1127, 1129 (1996). The majority of this Court similarly accords no deference to the Board's interpretation of the contract.

Simply because courts usually characterize contract interpretation issues as "questions of law" is no reason for refusing to give some deference to the expertise of an administrative agency which was created by the Legislature specifically for the purpose of interpreting and applying public contracts.

The characterization of contract interpretation issues as "legal questions" is, analytically, inaccurate. The characterization is basically for the purpose of distinguishing the role of a judge from that of a jury in contract suits brought initially in court. This has long been pointed out by the highest authorities in the field of contract law. Thus, Professor Samuel Williston has stated (4 *Williston On Contracts*, § 616 at 648–649 (3d ed.1961), footnotes omitted):

"It is obvious that the meaning of language is a question of fact. The code or standard by which it is sought to test the meaning must be discovered frequently by evidence of the

facts and circumstances concerning the making of the contract. Even though the question concerns merely the normal meaning of a word as found in dictionaries, it is still a question of fact, if the word 'fact' is used in a truly literal sense.

"Despite the rule repeatedly enunciated that questions of fact are the province of the jury, while questions of law are to be resolved by the court, the 'judges have always answered a multitude of questions of ultimate fact, of fact which forms part of the issue. It is true that this is often disguised by calling them questions of law.' The reason for this seems to have been a distrust of the jury's ability to answer questions of fact that call for nice discrimination and an educated mind. The interpretation of written documents has largely been withdrawn from the jury in this way. The general rule is that interpretation of a writing is for the court."

Professor Corbin has made the same point (3 *Corbin On Contracts*, § 554, at 219–222 (1960 ed.), footnotes omitted):

"The question of interpretation of language and conduct—the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law. This is true whether the court is searching for the meaning of the two contracting parties, or for the meaning given to words by the one person who used them, or for the meaning that was given to words by another person who heard or read them and acted in reliance on them, or for the meaning that a reasonable man or an intelligent user of English or an average resident of the community would have given to them. There is no 'legal' meaning, separate and distinct from some person's meaning in fact.

"We must bear in mind, however, that this question of fact is like other questions of fact in this: it may be a question that should be answered by the judge rather than by the jury. In cases in which it is so answered, it is probable that the interpreting judge may say that interpretation of language is a 'question of law for the court.' So

often has this been said throughout our legal history that we might be justified in defining 'question of law' as any question that is answered by the court rather than by the jury. That is to say, we might have justification in judicial usage of the term. The adoption of this usage, however, would make the term useless except as a term that is descriptive of results—a basket into which to throw court decisions after they have been made; it would be of no service in classifying questions so as to help the court to determine whether the question before it ought to be answered by the judge or should be submitted to a jury. Of course, in cases in which no jury is impaneled, the distinction between fact and law loses a part of its significance."

*See also* 3 Lawrence A. Cunningham and Arthur J. Jacobson, *Corbin On Contracts,* § 554 (1960 ed., 1998 Supp.).

A board of contract appeals, created to deal with public contracts of the type here involved, and having developed expertise in the field, should not be treated like a jury with respect to contract interpretation. Included in the expertise of the administrative agency is its knowledge of the jargon and technical language used in the relevant field. The relationship between a judge and a jury, and a reviewing court and an adjudicatory administrative agency, is quite different. Consequently, courts regularly accord some deference to contract interpretations by boards of contract appeals. *See, e.g., ICSD Corp. v. U.S.,* 934 F.2d 313, 315 (Fed.Cir.1991) ("The Board's interpretation of a contract, while freely reviewable as a question of law, is afforded careful consideration and great respect"); *Wright Const. Co. Through Rembrant, Inc. v. U.S.,* 919 F.2d 1569, 1571 (Fed.Cir.1990) ("Since contract interpretation is a question of law, the Board's interpretation is not binding upon us.... But because of the Board's expertise on questions of government contracts, we give some weight to the Board's interpretation of particular contractual language"); *Fruin–Colnon Corp. v. U.S.,* 912 F.2d 1426, 1429 (Fed.Cir. 1990) ("a board's interpretation of a contract is not binding upon this court.... Nonetheless, we give careful consideration and great respect to a board's interpretation because

legal interpretations by tribunals having expertise are helpful even if not compelling"); *George Hyman Const. Co. v. U.S.*, 215 Ct.Cl. 70, 564 F.2d 939, 944 (1977) ("The interpretation of a contract is a question of law for the court to decide and an administrative interpretation of a contract is not binding on the court. . . . However, a Board's interpretation of a contract will be given careful consideration and accorded great respect").

In this case, neither the majority of this Court nor the Court of Special Appeals has given any consideration to the Board's interpretation of the contract. In my view, this approach is incorrect. Moreover, even approaching the contract interpretation issue de novo, I agree with the Board that MTA was not required to indemnify CSXT. I would reverse the Court of Special Appeals and affirm the Circuit Court.

Judges CHASANOW and RAKER have authorized me to state that they concur with the views expressed herein and join this opinion.