Opinion issued December 4, 2008



     









In The
Court of Appeals
For The
First District of Texas




NO. 01-07-00187-CV




CMA-CGM (AMERICA) INC., Appellant

V.

EMPIRE TRUCK LINES INC., Appellee




On Appeal from the 113th District Court
Harris County, Texas
Trial Court Cause No. 2005-22806


 

O P I N I O N

          This appeal concerns the terms of an Uniform Intermodal Interchange and
Facilities Access Agreement (“the Agreement”) that provides that the laws of
Maryland shall govern over the interpretation of the agreement. Appellant, CMA-CGM (America), Inc., appeals the trial court’s dismissal of its claims for
indemnification against appellee, Empire Truck Lines Inc. In three issues, CMA
contends that the trial court erred by (1) applying Texas law to the Agreement; (2)
ruling that the Agreement was not enforceable; and (3) finding that CMA spoliated
evidence by losing the chassis made the subject of this suit. We conclude the
Agreement is enforceable under Maryland law, which is the law to be applied under
the terms of the Agreement. We also conclude that the issue concerning spoliation
instruction is not preserved for appeal because the sanctions order was in favor of a
person who is not a party to this appeal and the trial court did not rule on the motion
for summary judgment pertaining to the spoliation instruction. We reverse and
remand.BackgroundHector Aguirre was an independent contractor truck driver for Empire. Empire
sent Aguirre to transport cargo from Longview, Texas to the Port of Houston. The
cargo was in a storage container leased by CMA. The cargo was to be transported on
an adjustable-length chassis, but the chassis broke apart while its length was being
adjusted, causing Aguirre to be injured. Aguirre sued Empire and CMA, as well as
other defendants, alleging various causes of action.
          CMA filed a cross-claim against Empire asserting the Agreement required
Empire to insure, defend, and indemnify CMA for CMA’s own legal fault.
          The Agreement contains the following definitions:
4.Equipment: Equipment . . . includ[es] . . . chassis . . . .
 
5.Equipment Owner: The holder of beneficial title to the
Equipment, regardless of the form of the title.

          . . . .
 
8.Indemnitees: Provider, Equipment Owner and/or Facility Owner,
as their interest may appear.

          . . . .
 
11.Motor Carrier: The Party being granted access to the Provider’s
facilities and/or having physical possession of the Equipment for
the purpose of road transport or its designated agent or contractor.

          . . . .
 
14.Provider: the Party authorizing delivery and/or receipt of physical
possession of Equipment with a Motor Carrier.

Applying the definitions in the Agreement, Empire is the “Motor Carrier” and CMA
is the “Equipment Provider,” as well as an “Indemnitee.”
          Inserting the names of the companies in place of the general terms, Section F.4,
“Liability, Indemnity, and Insurance,” of the Agreement states,
4.Indemnity: [EMPIRE] AGREES TO DEFEND, HOLD
HARMLESS AND FULLY INDEMNIFY [CMA], AGAINST
ANY AND ALL CLAIMS, SUITS, LOSS, DAMAGE OR
LIABILITY, FOR BODILY INJURY, DEATH, AND/OR
PROPERTY DAMAGE . . . ARISING OUT OF OR
RELATED TO [EMPIRE’S] USE OR MAINTENANCE OF
THE EQUIPMENT DURING AN INTERCHANGE
PERIOD; THE PERFORMANCE OF THIS AGREEMENT;
AND/OR PRESENCE ON THE FACILITY OPERATOR’S
PREMISES.

          . . . .
6.Insurance: to the extent permitted by law, [Empire] shall provide
the following insurance coverages in fulfillment of its legal
liability and obligations contained in this Agreement:
 
a.A commercial automobile liability policy with a
combined single limit of $1,000,000 or greater,
insuring all Equipment involved in Interchange
including vehicles of its agent or contractors; said
insurance policy shall name [CMA] as additional
insured.
 
b.A commercial general liability policy with a
combined single limit of $1,000,000 or greater[.]
 
c.[Empire] shall have in effect, and attached to its
commercial automobile policy, a Truckers Uniform
Intermodal Interchange Endorsement (UIIE-1),
which includes the coverages specified in Section
F.4. . . . .
The Agreement also expressly states, “If it is determined that, at the time of the
interchange, [Empire] was not insured in accordance with Section F.6. of this
Agreement, [Empire] shall have been in material breach of this Agreement . . . .” The
Agreement also provides, “This Agreement, including its Addendum, but only to the
extent that its terms do not conflict with this Agreement, contain[s] the entire
Agreement of the Parties hereto.” Finally, the Agreement states, “Governing Law:
The laws of the state of Maryland, the location at the principal place of business of
the Intermodal Association of North America shall govern the validity, construction,
enforcement and interpretation of this Agreement without regard to conflicts of law
principles.”
          Before Aguirre settled his claims with Empire and CMA, he obtained an order
from the trial court granting his motion for sanctions due to CMA’s failure to produce
the chassis and chassis documentation. The order was entitled, “Order on Plaintiff,
Hector Aguirre’s Motion for Sanctions Against CMA . . . .” The order provided that
CMA would be prohibited from entering evidence of maintenance or repairs done to
the chassis, other than as reflected in documents that were produced. The order
further decreed that at the time of trial the jury would be given an instruction to
presume that CMA “intentionally or negligently destroyed evidence that is harmful
to their case and that the jury should presume that the missing evidence would have
been harmful” to CMA’s case.
          When Aguirre settled with Empire and CMA, the only remaining controversy
was CMA’s cross-claim for indemnification from Empire. Empire filed a motion for
summary judgment, asserting “[CMA] cannot maintain a claim against Empire.” 
Empire also filed a supplemental motion for summary judgment asserting that, as a
matter of public policy, it could not be liable for indemnification to CMA for
evidence spoliated by CMA. CMA filed a cross-motion for summary judgment
asserting that it established all elements of its breach of contract action against
Empire as a matter of law. At the hearing on the motions for summary judgment, the
trial court stated that it was not ruling on the motions for summary judgment, but only
construing the Agreement as a matter of law. The trial court did not expressly state
that it was applying Maryland law, but, immediately before making its ruling, it
referred to a case where Maryland law was applied. The trial court announced its
decision by stating, “I agree with Empire. I do not think that the contract requires
them to indemnify CMA for their own liability.” After the hearing, the trial court
entered an order stating,
On the 6th day of November, 2006, came on to be heard the
motion of [Empire] to dismiss the cross-claim of [CMA] for indemnity
because the indemnity agreement . . . was not enforceable, . . . the court
being of the opinion that said indemnity agreement is not enforceable,
it is
 
ORDERED that the claims of defendant/cross-plaintiff [CMA],
against defendant/cross-defendant [Empire], are dismissed with
prejudice to the re-filing of same.

Choice of Law
          In its second issue, CMA contends that Maryland law should be applied to
interpret the terms of this Agreement. CMA’s second issue is premised on the
assumption that the trial court applied Texas substantive law to the Agreement. The
trial court did not specify whether it was applying Texas or Maryland law to the
Agreement, although it appears from the trial court’s comments that it was
considering Maryland law. Empire responds that indemnity is a procedural issue that
should be controlled by the law of the state of Texas, rather than a substantive issue
to which the terms of the contract would apply. Empire also responds that applying
Maryland law would violate the public policy of Texas because the public policy of
the state of Texas limits the rights of parties to contract for indemnity. 
          Under Texas procedural law, parties “may express in their agreement their
choice that the law of a specified jurisdiction will apply to their contract.” Nexen,
Inc. v. Gulf Interstate Eng’g Co., 224 S.W.3d 412, 419 (Tex. App.—Houston [1st
Dist.] 2006, no pet.) (quoting Chase Manhattan Bank, N.A. v. Greenbriar N. Section
II, 835 S.W.2d 720, 723 (Tex. App.—Houston [1st Dist.] 1992, no writ)). When, as
here, “the parties reside or expect to perform their respective obligations in different
jurisdictions, they may be uncertain about which jurisdiction’s law will govern the
construction and enforcement of the contract.” Id. (citing Chase Manhattan, 835
S.W.2d at 723). “In an attempt to avoid this uncertainty, they may express in their
agreement their choice that the law of a specified jurisdiction will apply to their
contract.” Id. (citing Chase Manhattan, 835 S.W.2d at 723). “Judicial respect for
their choice promotes the policy of protecting their expectations.” Id. (citing Chase
Manhattan, 835 S.W.2d at 723) (internal citations omitted). Texas procedural law
allows parties to choose the law to be applied in interpreting the substantive terms of
an indemnity agreement. See id. at 419–20.
          Although parties may express in their agreement their choice that the law of a
specified jurisdiction will apply to their contract, they may not “thwart or offend the
public policy of the state whose law would otherwise apply.” Id. (citing Chase
Manhattan, 835 S.W.2d at 723). The Texas Supreme Court has noted that
“application of the law of another state is not contrary to the fundamental policy of
the forum merely because it leads to a different result than would obtain under the
forum’s law.” DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 680 (Tex. 1990). 
“Moreover, the fact that the law of another state is materially different from the law
of this state does not itself establish that application of the other state’s law would
offend the fundamental policy of Texas.” Id. 
          Applying Maryland law to this dispute does not violate the public policy of
Texas because both Maryland and Texas allow indemnification for a party’s own
negligence. In Texas, a party may be indemnified for its own negligence if the
indemnification agreement meets the “express negligence” test. See Storage &
Processors, Inc. v. Reyes, 134 S.W.3d 190, 192 (Tex. 2004) (citing Ethyl Corp. v.
Daniel Constr. Co., 725 S.W.2d 705, 707 (Tex. 1987)). Maryland also allows such
provisions to be enforced if they are “clear and unequivocal.” See Mass Transit
Admin. v. CSX Transp., Inc., 708 A.2d 298, 308 (Md. 1998) (citing Heat & Power
Corp. v. Air Prods. & Chems., Inc., 578 A.2d 1202, 1206–07 (Md. 1990)). Here,
neither party disputes that if the Agreement meets the appropriate test (“express
negligence” in Texas or “clear and unequivocal” in Maryland), then the indemnity
provision of the Agreement is enforceable. Texas and Maryland have the same
general rule, but the states differ in that Maryland recognizes an exception to the
general rule, as explained more fully below. Although Maryland law is not identical
to Texas law, the application of Maryland law would not “thwart or offend the public
policy of” Texas because Texas and Maryland have the general policy to allow
indemnification for one’s own negligence. See Nexen, 224 S.W.3d at 419.
          Because parties “may express in their agreement their choice that the law of a
specified jurisdiction will apply to their contract,” we hold that, in accordance with
the terms of the Agreement entered into by the parties, Maryland law shall govern the
validity, construction, enforcement and interpretation of this Agreement. See id.



          We sustain CMA’s second issue.
Enforceability of the Indemnity Provision Under Maryland Law
          In its first issue, CMA contends the trial court erred by dismissing the suit on
the grounds that the Agreement was not enforceable. We conclude that this
Agreement is enforceable as an insurance contract.
          In Maryland, the general rule is that “contracts will not be construed to
indemnify a person against his own negligence unless an intention to do so is
expressed in those very words or in other unequivocal terms.” Mass Transit, 708
A.2d at 308 (quoting Heat & Power, 578 A.2d at 1206–07). However, the general
rule does not apply to an insurance contract. Id. (citing Heat & Power, 578 A.2d at
1208).
          In Mass Transit, the Maryland Supreme Court upheld an indemnity provision
by concluding that the Mass Transit Administration (MTA) provided indemnification
for the liability of CSXT for CSXT’s own acts and omissions in “unequivocal terms.” 
Id. at 304. The contractual language in the contract between MTA and CSXT stated, 
(b) Indemnification by [MTA]
 
(1)[MTA] agrees to indemnify, save harmless, and defend CSXT
from any and all casualty losses, claims, suits, damages or
liability of every kind arising out of the Contract Service under
this Agreement, up to a maximum amount of One Hundred Fifty
Million Dollars ($150,000,000), per occurrence, during the term
of this Agreement, as excepted or limited by the terms of
subsections (a), (c), (d), and (e), infra. This maximum
indemnification amount shall include any expenses for outside
manpower, for legal representation and for other extraordinary
expenses of handling individual claims for [MTA]. . . .
 
Id. at 300. MTA agreed “to self-insure Five Million Dollars ($5,000,000) per
occurrence of any casualty claim or loss for which it is responsible” under the
contract. Id. MTA agreed, at its cost and expense, to procure and maintain “excess
liability insurance coverage commonly provided by Railroad operations liability
insurance” in the amount of $145 million in excess of the $5 million “self-insured
retention.” Id. The contract further provided: “This insurance shall cover liability
assumed by [MTA] under this [contract] . . . and shall name the State of Maryland and
[MTA] as insured. Such insurance policies shall name CSXT as an additional insured
for CSXT’s operation of the Contract Service . . . . Id.  
          The terms of the Agreement here are similar to the terms in the contract in
Mass Transit by stating “[Empire] agrees to defend, hold harmless and fully
indemnify [CMA], against any and all claims, suits, loss, damage or liability, for
bodily injury, death, and/or property damage . . . arising out of or related to
[Empire’s] use or maintenance of the equipment . . . .” See id. We conclude that the
terms of the Agreement expressly provide that Empire will indemnify CMA against
any and all claims arising out of or related to Empire’s use or maintenance of the
equipment. See id. 
          We also determine, based on an examination of the purpose of the Agreement,
that the Agreement here is similar to the contract in Mass Transit. See id. In Mass
Transit, the court examined whether the party giving the indemnification was the
hirer or the party performing the service. Id. at 303–04. The court noted that the party
performing the service would more likely indemnify the party that hired it to perform
the service to protect the hirer from vicarious liability. Id. The court explained, 
Heat & Power involved a promise by one who was hired to perform a
service to indemnify the person for whom the service was to be
performed. In that relationship the person for whom the service is to be
performed incurs a risk that the conduct of the person providing the
service will create vicarious liability on the part of the hirer, or that the
conduct may involve a non-delegable duty. Consequently, we require
that there be no ambiguity and that the indemnification, if intended to
embrace the sole negligence of the indemnitee, be unequivocal. The
indemnification provision in the instant matter, however, reverses the
direction of the indemnification from that more commonly encountered.
Here, the hirer of the service gives the indemnity, and the party
performing the service is indemnified. 

Id. (citations omitted). As in Mass Transit, this Agreement provides that Empire, the
party performing the service and using the equipment, is to indemnify CMA, the party
who is providing the equipment, in order to cover the risk of vicarious liability to
CMA stemming from Empire’s use of the equipment. See id. 
          In Mass Transit, the court also noted that the terms of the contract required
self-insurance and excess liability insurance to cover any claim or loss for which
MTA was responsible under the contract. See id. at 300. Like the contract in Mass
Transit, this Agreement requires Empire to provide “insurance coverages in
fulfillment of its legal liability and obligations contained in this Agreement.” 
          Our decision is in line with the courts that have analyzed Mass Transit to
determine that the terms used in the Uniform Intermodal Interchange and Facilities
Access Agreement provide for indemnification for the equipment provider’s own acts
or omissions. See Garcia v. Maersk, Inc., No. 03-CV-5697 FB RML, 2005 WL
1492380, at *4 (E.D.N.Y. June 24, 2005); Lopez v. Louro, No. 01 CIV 2490(JSM),
2002 WL 91273, at *1 (S.D.N.Y. Jan. 23, 2002). Moreover, another federal court
interpreting an agreement with language identical to the Agreement in this case
determined that the agreement was one of insurance, stating, 
First, although the Interchange Agreement is not an insurance contract
or policy, per se, it is an agreement pursuant to which [Motor Carrier]
agreed to indemnify [Equipment Provider], defend [Equipment
Provider] and procure insurance which would include [Equipment
Provider] as an additional insured for claims, suits, losses, damages or
liabilities for bodily injury or death arising out of [Motor Carrier]’s use
of the chassis or container owned by [Equipment Provider]. These
obligations and the terms of art invoked therein are typically part of an
insurance contract with an insurance company. Accordingly, the scope
of the various obligations has been examined and interpreted by courts
and agencies as a part of a body of “insurance law”. Therefore, reference
to decisions involving these same obligations as they arise in insurance
policies is appropriate, as the clear intent of Section F of the Interchange
Agreement is to sort through the insurance related obligations of the
signatories. Indeed, Section F is titled “Liability, Indemnity and
Insurance” and as provider of the indemnity, short of passing that
obligation off to an insurance company, [Motor Carrier] is for all
practical purposes an insurer and [Equipment Provider] the insured.

YK Line v. PB Industries, Inc., No. TH02-0074-C-T/H, 2004 WL 1629613, at *4
(S.D. Ind. Apr. 20, 2004) (footnote omitted). This Agreement is effectively an
insurance contract, which is the exception to the Mass Transit general rule that
“contracts will not be construed to indemnify a person against his own negligence
unless an intention to do so is expressed in those very words or in other unequivocal
terms.” See Mass Transit, 708 A.2d at 303 (quoting Heat & Power, 578 A.2d at
1206–07).     
          Empire nevertheless contends Mass Transit is distinguishable and that the New
York Federal District Court cases are in error because the agreement in the Mass
Transit case “includ[ed] the requirement that MTA insure CSXT and a specific
requirement that MTA add CSXT as an insured under MTA’s insurance policy.” See
id. at 301. Empire contends the Agreement here did not require Empire to provide
insurance for CMA. To support this contention, Empire refers to the addendum to the
Agreement, a “Certificate of Liability Insurance” that includes an “Equipment
Provider List.” On this list, certain equipment providers have either a single or
double asterisk next to their names. The addendum provides, “The companies above
indicated with a single asterisk require that you make them additional insured on your
General Liability Policy. The companies above indicated with a double asterisk
require that you make them additional insured on your Cargo and/or Trailer
Interchange coverages.” Empire asserts that because CGA does not have an asterisk
by its name, it did not have to be named an additional insured and that Mass Transit
therefore does not apply. As noted above, the Agreement provides that the addendum
is part of the Agreement, “but only to the extent that its terms do not conflict with this
Agreement.” The plain language of the Agreement requires Empire to provide
“insurance coverages in fulfillment of its legal liability and obligations contained in
this Agreement.” Under the Mass Transit analysis, this indicates a clear and
unequivocal intention to indemnify CMA for its own acts or omissions. To the extent
that the addendum conflicts with that clear and unequivocal intent, the Agreement
provides that it is not binding upon the parties. 
          We hold that the Agreement is enforceable under Maryland law and that the
trial court erred by dismissing the suit on the grounds that the Agreement was not
enforceable.
          We sustain CMA’s first issue. 
Spoliation
          In its third issue, CMA challenges the trial court’s order imposing a spoliation
instruction as a discovery sanction. CMA contends that the trial court erred by
deciding that at the time of the trial of Aguirre’s claims, it would prohibit CMA from
entering certain evidence and instruct the jury that the missing evidence should be
presumed to be harmful to CMA’s case. However, Aguirre and CMA settled the case
without a jury trial, and they asked the trial court to accept the settlement. To the
extent that CMA is challenging the spoliation order granted in favor of Aguirre, CMA
has waived any complaint because the case settled without a jury trial. See Baker v.
Fed. Exp. Corp., 224 S.W.3d 390, 394 (Tex. App.—Houston [1st Dist.] 2006, no pet.)
(finding party waived complaint concerning spoliation instruction where trial court
did not instruct jury and parties asked court to accept settlement agreement); see also
Psych. Insts. of Am., Inc. v. O’Neill, 819 S.W.2d 805, 806 (Tex. 1991) (orig.
proceeding) (holding mandamus concerning discovery dispute was rendered moot by
settlement of underlying case). 
          In this appeal, CMA also asserts that the spoliation ruling affects whether we
should apply Texas law or Maryland law. That argument was raised in Empire’s
motion for summary judgment. However, the trial court expressly stated, and the
parties agreed, that the trial court was only construing the Agreement as a matter of
law and the court was not ruling on any of the issues raised in the motions for
summary judgment. Because the trial court never ruled on the matter of whether the
spoliation of evidence would affect which law should be applied, nothing is preserved
for our review. See Tex. R. App. P. 33.1(a)(2)(A); De Miño v. Sheridan, 176 S.W.3d
359, 373 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (holding party must obtain
ruling on motion to preserve error). Finding nothing preserved for our review, we
overrule CMA’s third issue.

Conclusion
          We reverse the trial court’s order dismissing CMA-CGM (America) Inc.’s
cross-claim and remand this cause to the trial court for further proceedings consistent
with this opinion.



                                                             Elsa Alcala
                                                             Justice

Panel consists of Justices Taft, Keyes, and Alcala.